Cardell **SHAIRD**, Petitioner,

v.

Charles **SCULLY**, Superintendent, Greenhaven Correctional Facility, Stormville, New York and Robert Abrams, Attorney General of the State of New York, Respondents.

No. 82 Civ. 320 (IBC).

United States District Court,
S.D. New York.

March 21, 1985.

Cardell Shaird, pro se.

Robert M. Morgenthau, Dist. Atty., New York County, New York City, for respondents; Amyjane Rettew, Ethan Greenberg, Asst. Dist. Attys., of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

Petitioner applies for a writ of habeas corpus under 28 U.S.C. § 2254.

On September 8, 1978, following a jury trial in the Supreme Court of the State of New York, New York County, petitioner was convicted of murder in the second degree under N.Y.P.L. § 125.25. Petitioner was sentenced to life imprisonment with a minimum of fifteen years, the sentence to run consecutively with any time owed for a parole violation. On September 25, 1980, the Appellate Division of the New York Supreme Court, First Department, affirmed petitioner's conviction. On October 28, 1980, the Court of Appeals of the State of New York denied his application for leave to appeal.

Before addressing the issues raised in this petition, we note that a fire occurred at the locale housing the transcript of petitioner's trial; consequently, much of it was burned. In addition, as Ethan Greenberg, Esq., counsel for respondent, learned after extensive inquiry (*see* letter from Mr. Greenberg to Chambers dated September 5, 1984), almost nothing of significance from the official court reporter's minutes remain in existence.

We are not, however, precluded from review of the petition. According to 28 U.S.C. § 2254(e):

> If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination. If the applicant, because of indigency or other reason is unable to pro-

duce such part of the record, then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official. *If the State cannot provide such pertinent part of the record, then the court shall determine under the existing facts and circumstances what weight shall be given to the State court's factual determination.* (emphasis added)

In the present case, respondents provided us with the following documents: (1) Transcript of the Wade hearing (pre-trial identification) held on May 12, 1978; (2) Transcript of the sentencing hearing held on September 8, 1978; (3) Petitioner's brief to the Appellate Division, along with respondents' brief and appendix. *Both briefs make extensive references to the trial transcript.*

The existing record (the only sources available) having been produced, and petitioner and respondents being in substantial agreement as to the facts, we decide this petition on the basis of the material presented to us in accordance with 28 U.S.C. § 2254(e).

## I. *Appointment of Counsel*

■ In addition to his application for a writ of habeas corpus, petitioner moves for the appointment of counsel. A determination thereon requires a close examination and evaluation of certain factors such as the likelihood of success on the merits, the complexity of the legal issues raised by the complaint and the ability of the indigent (here, petitioner) to investigate and present the case. *Weygandt v. Look,* 718 F.2d 952 (9th Cir.1983); *Wilson v. Duckworth,* 716 F.2d 415 (7th Cir.1983).

We find that petitioner was adequately represented at both the trial and appellate levels. Furthermore, it is abundantly clear that the legal issues raised in the instant proceeding are not complex and do not require involved inquiry. Finally, given the factual and legal grounds present in this case, it is most unlikely that the petitioner would succeed on the merits.

■ Consequently, in the exercise of our discretionary power (pursuant to 18 U.S.C. § 3006A(g)) to appoint counsel to habeas corpus petitioners, we are convinced that the interests of justice in the instant application do not require appointment of counsel.

## II. *Petition for Habeas Corpus Relief*

The key facts giving rise to the conviction are as follows: On August 6, 1976, petitioner Cardell Shaird entered "Pee Wee's Bar and Grill," located at Avenue A and 13th Street in Manhattan, with an acquaintance named John Cordero. Mr. Shaird was the manager and resident of "The Tree," an "after-hours" club located across the street from "Pee Wee's." Mr. Shaird had visited "Pee Wee's" on several occasions after having introduced himself to the owner, Emmit Walthall. (Respondents' brief at 4)

At 6:00 P.M., when petitioner and Mr. Cordero entered "Pee Wee's," several men were sitting outside drinking beer, and twelve to twenty men were sitting inside drinking and playing cards. (Respondents' brief at 6) After petitioner had ordered a round of drinks for Mr. Cordero and himself, he asked the bartender "for a drink on the house or a 'buy back.'" (Respondents' brief at 7) The bartender checked with Mr. Walthall, who "said he would not give a free drink for every drink bought." (Respondents, brief at 7; *see* Petitioner's brief at 10) Mr. Shaird persisted in his demand; the bartender merely shrugged. Petitioner then asked Mr. Walthall for free drinks, reminding him that he had received free drinks from him at "The Tree" "so that Walthall owed him one." (Respondents' brief at 7)

The arguing continued for another ten to twenty minutes; finally, Mr. Walthall got up and walked over to Mr. Shaird. According to Mr. Cordero, the two men "were face to face about one foot apart." (Petitioner's brief at 11) Mr. Cordero continued drinking, not wanting to get involved; the bartender went to the bathroom. John Paser, a customer who was sitting to the

left of Mr. Shaird and was playing cards, heard Mr. Walthall say, "What are you going to do—shoot me or something?" (Petitioner's brief at 14; *see* Respondents' brief at 8) We observe that Mr. Paser testified that he was not sure if Mr. Walthall said "kill me" or "shoot me." (Respondents' brief at 8) Both Messrs. Paser and Cordero "heard a shot, and turned to see Walthall fall to the floor." (*Id.*)

Messrs. Paser and Cordero testified that neither one of them saw a gun. (Petitioner's brief at 15) Mr. Cordero testified that he did not remember seeing Mr. Shaird "reach into or out of the bag [he was carrying]." (Petitioner's brief at 11) Mr. Paser saw Mr. Shaird stand over Mr. Walthall for a moment. (Petitioner's brief at 14–15; Respondents' brief at 8)

After hearing the gunshot, Mr. Cordero panicked and ran out of the bar followed by Mr. Shaird. At that time, Mr. Cordero had nothing in his hand; petitioner however was carrying his shoulder bag. One of the men sitting outside the bar, Mr. Louis Levay, who had "consummed [sic] about five to six cans of beer," (Petitioner's brief at 16) saw Messrs. Cordero and Shaird leave the bar, and noticed that "petitioner, who was shorter and darker-skinned than his companion, was carrying a shoulder bag." (Respondents' brief at 9; *see* Petitioner's brief at 15)

Seconds later, "Levay heard shouting from inside the bar" (Respondents' brief at 9); "[s]omeone yelled that the men who had just left had shot Pee Wee." (Petitioner's brief at 15; Respondents' brief at 9) Mr. Levay testified that he saw Mr. Shaird "standing three to four car lengths down the block on the south side of the street, the same side as the bar. Petitioner had an object which was approximately two feet long in his hand. He repeatedly banged the object against the gutter. Levay could not tell what the object was, but saw petitioner break it apart into two pieces and throw them under a car. Petitioner crossed to the north side of the street and ran east." (Respondents' brief at 9; *see* Petitioner's brief at 16)

Two police officers in the vicinity saw the crowd in front of "Pee Wee's" bar. The people in the crowd yelled that a man had been shot and pointed to Messrs. Shaird and Cordero, the only persons running east on 13th Street. (Petitioner's brief at 17; Respondents' brief at 10)

The police returned to "Pee Wee's" and, acting on the information provided by Mr. Levay, looked under the car where Mr. Levay had seen petitioner throw the two foot long object. There one of the officers "recovered the stock and barrel of a sawed-off shotgun. The shotgun contained one spent and two unspent shells. Near the gun on the sidewalk ... [he also] recovered a leather shoulder bag which contained a perforation. He also found four T-shirts which were printed with the words 'The Tree' ..." (the club owned by petitioner across the street from "Pee Wee's"). (Respondents' brief at 10; *see* Petitioner's brief at 18)

Another police officer who arrived at the scene "found Walthall lying on the floor with a towel on his stomach and his head in someone's lap. The towel was soaked with blood and Walthall appeared to be in pain. [The officer] asked Walthall who had shot him and Walthall said, 'Blood.' [The officer] asked who 'Blood' was and Walthall said, 'Blood has the bar across the street.' Walthall answered [the officer's] question as to which bar by saying, 'The Tree.'" (Respondents' brief at 11; *see* Petitioner's brief at 19–20)

At an identification proceeding, Mr. Levay "identified petitioner and Mr. Cordero as the two men he had seen leave the bar. He identified petitioner as the man who had carried the shoulder bag and had hidden something under a car" (i.e., the man who he had seen break into two pieces an object approximately two feet long which the same man then threw under an automobile). (Respondents' brief at 12) At trial, Levay testified he could not identify petitioner, adding he had consumed five to six beers during that evening in question. (Petitioner's brief at 16)

Petitioner was advised of his legal rights by the police officers. He told them "that he had been in a park, 'making a buy,' when he had got into a fight. He left the park and was walking past Pee Wee's Bar when he was arrested. Petitioner also told the officer that his nickname was 'Blood.'" (Respondents' brief at 12–13; see Petitioner's brief at 18) The police officers noticed nothing unusual about petitioner's appearance at the questioning other than an injury to his right hand. (Petitioner's brief at 18–19; Respondents' brief at 12–13)

The officers then took petitioner to be treated at a hospital for his cut. (Petitioner's brief at 19; Respondents' brief at 13) The notations in the hospital records make no mention as to whether Mr. Shaird was intoxicated. (Respondents' brief at 13) The doctor who treated Mr. Shaird "testified that the cut on petitioner's hand was consistent with the recoil of a gun on unprotected skin." (Respondents' brief at 13) However, he "admitted that the laceration could additionally have been caused by a beer can with a flip top." (Petitioner's brief at 23) Moreover, the doctor indicated that because hospital emergency rooms are so busy, "it was possible that a nurse might miss the fact that someone had alcohol on his breath or had glassy eyes." (Id.)

At trial, the ballistics officer, who examined the sawed-off shotgun found under the automobile one-half block from the shooting, testified that in order for that gun to fire, "the shooter had to load the cartridge, cock the hammer, only then to pull the trigger. While it would be difficult for someone to load the gun while it was contained in the shoulder bag, it would be easy to fire the gun inside the shoulder bag if a cartridge was already in place. Moreover, that the force released by the gun's firing would cause the gun to recoil, so that the shooter's hand could be cut by the hammer ripping backward into the webbing of the hand." (Respondents' brief at 15; see Petitioner's brief at 21)

Two officers testified "that the hole [in the leather bag] was consistent with a gun held flush with the leather while being discharged. The diameter of the hole was consistent with the diameter of the shotgun recovered, as were the lead residue and burned, darkened areas at the edge of the hole." (Respondents' brief at 16) The police acknowledged that an individual could cut a hole such as that which appeared in the bag with a knife. (Petitioner's brief at 22)

The medical examiner "concluded that the pattern of the entrance of the pellets ... was consistent with the shooter using a sawed-off shotgun and standing thirteen to sixteen inches away from the victim." (Respondents' brief at 14–15)

Messrs. Levay, Paser and Cordero and the bartender "all recognized the bag found outside Pee Wee's Bar as similar to the shoulder bag petitioner carried during the afternoon and evening of the murder." (Respondents' brief at 16)

Finally, one of the police officers at trial testified to his investigation of the ownership of "The Tree." He learned that "[a]fter petitioner's arrest, the Tree was closed for business.... [S]uppliers of the Tree and its two free lunch programs knew petitioner as 'Blood' and believed him to be the owner or manager of the Tree." (Respondents' brief at 16–17)

The grounds on which petitioner bases his application for habeas corpus relief include:

(1) Ineffective assistance of counsel: specifically, failure to raise an incompetency defense and failure to request a charge concerning intoxication or manslaughter;

(2) Constitutional defectiveness of the court's charge to the jury; and

(3) Deprivation of a fair trial by the court's alleged incorrect jury instruction on circumstantial evidence.

### 1. Ineffective Assistance of Counsel

Petitioner first argues that he was denied effective assistance of counsel. As spelled out in his appellate court brief by his attorney, Julia Heit, Esq., petitioner contends that his trial counsel's representa-

tion amounted to a farce and mockery; specifically, petitioner maintains that his counsel's failure to raise an intoxication or incompetency defense rendered his representation ineffective under the sixth amendment. Moreover, he contends that his trial counsel failed to request a reduced charge of manslaughter to be read to the jury and this omission greviously damaged his defense. (Petitioner's brief at 25–26) Petitioner further asserts that despite the fact that there was a large amount of evidence available to counsel, this defense was "suddenly dropped at trial with no explanation." (Petitioner's brief at 28)

Petitioner supports his argument with the following evidence:

(1) He was examined by two court appointed psychiatrists who each independently reported that Mr. Shaird "had insisted that he knew nothing about the charges [against him] as he had been subjected to heavy dosages of LSD at that time" (Petitioner's brief at 27);

(2) Petitioner's psychiatrist, Dr. Robert Gaukler, concluded that "at the time of the crime, [petitioner] had a diminished capacity and responsibility." Petitioner further notes that Dr. Gaukler's opinion "was corroborated by [petitioner's] medical record during the first month of his incarceration at Riker's Island ... that [petitioner] was given powerful antipsychotic drugs (Petitioner's brief at 27);

(3) Petitioner maintains that counsel had tremendous difficulties communicating with him, since Mr. Shaird "had virtually no recall of the events" (Petitioner's brief at 28); and

(4) Mr. Cordero testified that Mr. Shaird "had been a little drunk, high, or stoned during the incident." (Id.)

According to *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in order to prevail on an ineffective assistance of counsel claim, the defendant must show not only that counsel's representation fell below an objective standard of reasonableness, but the defendant must "affirmatively prove prejudice"

by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different in the sense of being more favorable to the defendant." *Id.* 104 S.Ct. at 2068. *See, e.g., Trapnell v. United States,* 725 F.2d 149, 151–52 (2d Cir.1983). Under this imperative standard, we cannot agree that petitioner was denied effective assistance of trial counsel. As respondents point out: "the choice of defense was, in fact, virtually mandated by the lack of any factual basis for the insanity or intoxication theories, and by the overwhelming proof of petitioner's ability to form the requisite intent." (Respondents' brief at 18) We agree. Petitioner, in attempting to second guess counsel's trial strategy, fails to show how, but for counsel's errors, he could have been successful at trial.

Furthermore, we find that prior to trial, counsel for Mr. Shaird thoroughly investigated his client's background. Counsel made sure Mr. Shaird was examined by several psychiatrists to determine his competency; he subpoenaed all hospital records concerning petitioner; and he interviewed Mr. Cordero. He additionally sought to suppress sympathetic testimony regarding Mr. Walthall's (the deceased) background and the treatment of Mr. Shaird's wound. (Respondents' brief at 20–21) Moreover, petitioner's trial attorney kept the intoxication and insanity defenses available until a very late point in the trial. (Respondents' brief at 27) Ultimately, counsel was forced to abandon these defenses due to dispositive testimony of three police officers showing that petitioner behaved normally and had appeared sober. Moreover, Mr. Cordero, while testifying that Mr. Shaird had appeared "a little drunk, high, or stoned," (Petitioner's brief at 28) indicated that petitioner was coordinated and coherent. (Respondents' brief at 27–28) His counsel decided that the better part of wisdom dictated proceeding on a theory of mistaken identity rather than intoxication or diminished capacity. Although counsel could have added the insanity and intoxication defenses to his mistak-

en identity theory, such a strategy would certainly have undermined petitioner's credibility in the eyes of the jury and would have greatly prejudiced his case, certainly not aided it.

Moreover, at petitioner's sentencing, petitioner admitted that while his counsel originally fashioned a defense based on insanity/diminished capacity,

"we did not present this defense because the case itself, in our opinion, did not warrant it. It didn't appear that the facts as the district attorney had presented them required our attention in that particular aspect, in that particular respect ..." (Sentencing hearing [colloquy] at 25)

In short, it cannot be successfully contended that counsel's representation was so lacking and prejudicial as to constitute ineffective assistance of counsel. We find that counsel reasonably and fastidiously opted to proceed on a mistaken identity theory.

For the reasons stated above, we have no hesitancy in concluding that petitioner's sixth amendment rights were not violated by defense counsel's decision not to present an intoxication or insanity defense to the jury.

### 2. Constitutional Defectiveness of the Court's Charge to the Jury

Petitioner asserts an unconstitutional shifting to the defendant of the burden of proof on the element of intent in the trial court's charge to the jury (in pertinent part):

A person's intent may be determined from his acts, words, on all facts and circumstances surrounding his conduct at the time that he allegedly committed the act.

To establish this element of intent to kill, the law requires that you probe the mind of the defendant just prior to and at the time that he is alleged to have shot and killed the deceased. It is for you the jury to determine the intent of the defendant and that is whether or not he intended to kill Emmit Walthall. In this respect, if you find that the defendant caused the death of Emmit Walthall, you have a right to consider all of the facts and circumstances surrounding the commission of this alleged crime. You have a right to consider the conduct of the defendant prior to and at the time of the alleged shooting, the purpose, if any, of the defendant's presence where the shooting took place, as well as the reasons, if any, for such shooting.

Also on the question of intent, you may presume that one intends the natural and probable consequences of his acts and you have the right to consider the medical examiner's testimony as to the cause of the death and whether the wounds were inflicted in the vital part of the victim's body.

The law gives you the right, solely by reason of the infliction of such wounds, to infer an intent on the part of the deceased or, rather, on the part of the slayer to commit the act of killing. You are not bound to infer an intent to kill from the use of a sawed-off shotgun, or from the infliction of serious physical injury to vital parts of the victim's body, if you so find, but you may make such an inference.

However, you should consider all of the evidence in determining the defendant's intent, if any, to cause the death of Emmit Walthall.

All of these circumstances are of the highest importance in determining the defendant's intent to kill. (Respondents' Appellate brief at 45–46)

■ Petitioner contends that under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), a jury instruction that shifts or appears to shift the burden of proof by permitting a presumption of intent violates the defendant's due process rights. We hold there is nothing in this inviolate rule of law that was offended in any way by the charge of the law by the trial judge. Consequently, we are not persuaded to the contrary by petitioner's emphatic disapproval. We are compelled at this point to emphasize the principle established in *Cupp v. Naughten,*

414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), that instructions to the jury must be viewed in the context of the *overall* charge; they cannot be understood in isolation from the rest of the charge.

Here, in charging the jury, the judge cautioned them with the permissive instruction that while the law permits a presumption that a defendant intends the natural and probable consequences of his act, they, the jury, were not bound to use the presumption. Moreover, the judge reiterated that the People had the burden of proving the element of intent beyond a reasonable doubt.

In the instant case, we need not even consider whether the trial judge "cured" a *Sandstrom* violation; we are overwhelmingly convinced from the record as a whole that no such violation occurred. Further, because of the court's use of permissive language in charging the jury, we find that even if a *Sandstrom* violation was committed (we repeat we cannot bring ourselves to see any merit in such a view) it was clearly cured. *See Brayboy v. Scully*, 695 F.2d 62 (2d Cir.1982), *cert. denied*, 460 U.S. 1055, 103 S.Ct. 1505, 75 L.Ed.2d 934 (1983); *Mancuso v. Harris*, 677 F.2d 206 (2d Cir. 1982), *cert. denied*, 459 U.S. 1019, 103 S.Ct. 382, 74 L.Ed.2d 514 (1983); *Washington v. Harris*, 650 F.2d 447 (2d Cir.1981), *cert. denied*, 455 U.S. 951, 102 S.Ct. 1455, 71 L.Ed.2d 666 (1982).

Accordingly, we find that there is no constitutional violation arising from the second ground advanced by petitioner.

*3. Deprivation of a Fair Trial*

Petitioner's final claim is that the trial court deprived him of a fair trial by refusing to instruct the jury that because of logical gaps in the proof presented, circumstantial evidence is of less value than direct evidence.

As respondent correctly notes, circumstantial evidence is fully as reliable as direct evidence. *United States v. Brady*, 579 F.2d 1121, 1127 (9th Cir.1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1978); *People v. Cleague*, 22 N.Y.2d 363, 292 N.Y.S.2d 861, 239 N.E.2d 617 (1968). Moreover, while not required under either federal or state law, *see United States v. Barnes*, 604 F.2d 121 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980); *People v. Barnes*, 50 N.Y.2d 375, 380, 429 N.Y.S.2d 178, 406 N.E.2d 1071 (1980), the court nonetheless instructed the jury that when assessing the circumstantial evidence adduced at trial, they must adhere to the standard of moral certainty (Respondents' brief at 37), the moral certainty test having been read to the jury. (Respondents' brief at 50) In short, in describing the weight to be accorded circumstantial evidence, the court simultaneously imposed the strict standard of moral certainty.

### Conclusion

For reasons hereinabove set forth, we conclude that petitioner was not deprived of a fair trial.

Accordingly, we are constrained to, and do, deny petitioner's application (under 28 U.S.C. § 2254) for habeas corpus relief in all respects.

SO ORDERED.