**Al MANCUSO, Petitioner-Appellee,**

**v.**

**David R. HARRIS, Superintendent of Greenhaven Correctional Facility and Robert Abrams, New York State Attorney General, Respondents-Appellants.**

**No. 755, Docket 81–2283.**

United States Court of Appeals, Second Circuit.

Argued March 4, 1982.

Decided April 13, 1982.

---

Cynthia Kean, Asst. Dist. Atty. (Elizabeth Holtzman, Dist. Atty., Kings County, of counsel) for respondents-appellants.

Steven Lloyd Barrett, The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel, for petitioner-appellee.

Before KAUFMAN and PIERCE, Circuit Judges and HAIGHT, District Judge.*

---

\* Hon. Charles S. Haight, Jr., United States District Judge for the Southern District of New York, sitting by designation.

1. The second count of Indictment No. 3414/76 charged Mancuso with causing the death of James M. Coppola in the course of a burglary committed on June 28, 1975, while "acting in concert with other persons actually present." Spagna and Dominick Vaccarino were charged with the same crime in Count 1 of Indictment No. 3415/76.

PIERCE, Circuit Judge:

Petitioner Al Mancuso and co-defendants, Dominick Vaccarino and Ronnie Spagna, were indicted for the killing of James Coppola during the course of a burglary of the victim's home on June 28, 1975.[1] Mancuso and Spagna were convicted of felony murder (N.Y.Penal Law § 125.25(3)) on May 11, 1978, after a trial before Justice Joseph R. Corso and a jury in the State Supreme Court for the County of Kings. Petitioner was sentenced to a prison term of 25 years to life. Both Mancuso and Spagna appealed their convictions to the Appellate Division, Second Department, which unanimously affirmed on September 17, 1979. 71 A.D.2d 994, 420 N.Y.S.2d 282. On December 4, 1979, leave to appeal to the New York Court of Appeals was denied.

On May 5, 1980, petitioner filed the instant application for a writ of habeas corpus. He alleged that the trial court judge committed error of constitutional dimension in charging the jury, *inter alia*, that

"Everyone is presumed to intend the natural consequences of his act and unless the act is done under circumstances or conditions that might preclude the existence of such intent, you, the jury, have to find, have a right to find the requisite intent from the proven actions of an individual."[2]

On July 23, 1981, Judge Platt adopted a Report and Recommendation of U.S. Magistrate John L. Caden which found that the above language impermissibly shifted the burden of proof to the defendant, and ordered the State to either retry the petition-

---

2. Petitioner objected to this charge at trial and challenged its constitutionality in his appeal to the Appellate Division. In affirming the convictions the Appellate Division stated that it was "aware of the holding in *Sandstrom v. Montana*," 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), but that it found the "charge on presumed intent was harmless." *People v. Spagna and Mancuso*, 71 A.D.2d 994, 420 N.Y. S.2d 282 (2d Dep't 1979). Therefore, the exhaustion requirement has been met. *See Washington v. Harris*, 650 F.2d 447, 452 (2d Cir. 1981).

er within ninety days or release him. The State of New York appeals from that order.

At the appellee's trial in the state court the prosecution relied mainly upon the testimony of alleged co-defendant Dominick Vaccarino, Dominick Vaccarino's common-law wife, Susan Heller, and his brother, Carl Vaccarino.

Dominick Vaccarino testified for the prosecution in return for a promise by the District Attorney that he would recommend to the court acceptance of a plea of guilty to manslaughter in the second degree and imposition of a sentence of five years probation in satisfaction of the count which charged felony murder.

At the time of the trial, Carl Vaccarino was incarcerated in New Jersey after a conviction for robbery in that state. He testified herein that the District Attorney had promised to inform the New Jersey authorities of his cooperation, which he hoped would help him obtain an early release on parole.

Several other prosecution witnesses provided testimony as to background information and details surrounding the burglary and killing which took place on June 28, 1975.

At the trial, Dominick Vaccarino testified that he first met one Frankie Tortorella through his brother, Carl, in mid-June of 1975; that about one week later Tortorella approached Dominick and Susan Heller about the possibility of burglarizing the home of Susan's uncle, James Coppola; and that neither Dominick nor Susan agreed to participate.[3] He testified further than on June 28, 1975, he saw Tortorella, who told him that he would be sending two men to burglarize Coppola's house. According to Dominick, defendant Mancuso and his co-defendant, Spagna, came to his home later that evening and stated that Frankie had sent them, and that they had just driven past Coppola's house, saw that it was all dark, and thought that it would be a good time to burglarize the house. Dominick Vaccarino agreed to become involved, and

left his home with Mancuso and Spagna in a green Gran Torino automobile. Dominick testified to the events which then transpired. He told the jury that he, Mancuso, and Spagna drove to Coppola's house and parked the car at the corner of the block. Mancuso and Spagna left the car after telling Vaccarino to wait in the driver's seat. However, Vaccarino left the car, walked down the block, and hid in the bushes directly across the street from Coppola's house. From there he observed Spagna go to the front door of the house and ring the doorbell while Mancuso hid in the bushes, wearing a ski mask. He testified that Coppola came to the door; Spagna spoke to him, and then he saw the two of them engage in a struggle at the door. Meanwhile, Mancuso ran past them and into the house. In the course of the struggle between Spagna and Coppola, the glass in the storm door broke and Spagna pulled out a pistol and fired one shot into the wall of the house. This bullet apparently did not hit Coppola. Spagna then turned and ran back to the car. At that point, Mancuso, still inside the house, fired at Coppola several times while running toward the door to leave, thereby apparently killing Coppola. When Mancuso reached the car, he and Spagna drove away. Vaccarino also fled and hitchhiked home. He testified that after he arrived at home Tortorella came to see him and they went to a bar in Queens where he saw Mancuso who told Dominick that if he told anyone what had happened he, Susan, and the baby "would be next."

Susan Heller and Carl Vaccarino corroborated details of Dominick Vaccarino's testimony.

Neither Mancuso nor Spagna testified at trial. Spagna presented an alibi defense. Mancuso sought to discredit the prosecution's witnesses, as to their motivation to testify, and with respect to the accuracy of various details of their testimony. Mancuso also presented the testimony of his close friend Frankie Tortorella, who denied that

---

**3.** Tortorella was charged with criminal solicitation and conspiracy in connection with the killing of Coppola. He was tried separately and acquitted.

he had seen Vaccarino on June 28, 1975, or that he had been involved in any way in burglarizing Coppola's home, or in attempting to induce Mancuso to participate in such a burglary.

## I. *Collateral Estoppel*

After exhausting his remedies in the state courts, petitioner's co-defendant, Spagna, filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York. He argued that Justice Corso's charge with regard to intent was in violation of the constitutional standard set forth by the Supreme Court in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). Judge Platt granted the writ on September 18, 1980. The State filed a notice of appeal from that order (Docket No. 80–2278), but never perfected the appeal and it was dismissed by the Clerk of this Court on November 19, 1980. Spagna pleaded guilty to reduced charges in the state court.

■ Appellee argues that since the Supreme Court held in *Parklane Hosiery v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), that collateral estoppel may be used offensively to prevent a defendant from relitigating issues previously litigated and lost against another plaintiff and since the dispositive issue in this case is identical to that in Spagna's, Judge Platt's earlier decision collaterally estops the State from litigating this appeal.[4] This argument is without merit. The Court's decision in *Parklane Hosiery* does not mandate the application of collateral estoppel whenever a party has had a previous opportunity to litigate an issue. On the contrary, in that case the Court stated only that it had determined *not to preclude* the offensive use of collateral estoppel and that trial courts

would be accorded "broad discretion to determine when it should be applied." 439 U.S. at 331, 99 S.Ct. at 651. It seems obvious that the principle should be applied with care. Further, in *Standefer v. United States*, 447 U.S. 10, 24–25, 100 S.Ct. 1999, 2008, 64 L.Ed.2d 689 (1980), the Supreme Court pointed out that although there would be no sound reason to burden the courts with repetitive litigation in civil cases, which are at bottom private disputes between private litigants seeking to enforce private rights, cases involving enforcement of the criminal law present " 'competing policy considerations' that outweigh the economy concerns that undergird the estoppel doctrine."

Although a petition for habeas corpus relief pursuant to 28 U.S.C. § 2254 initiates a civil proceeding in which the State is not bound by the strictures imposed upon it as prosecutor in a criminal proceeding, it is unquestionable that the federal court's review of the petition implicates the public interest in the enforcement of the criminal law in the state courts. While it is possible that a situation may arise in which it would be appropriate to apply principles of non-mutual collateral estoppel to prohibit the State from resisting an application for a writ of habeas corpus, this is not that case.

In a criminal trial before a jury, we may not assume that jury instructions have an identical impact with respect to any two or more defendants. Indeed, the state trial judge herein properly instructed the jury to "[b]ear in mind that in this one trial we have two defendants, but two separate and distinct cases are being tried here. The case of each defendant must stand on its own foundation." In addition, throughout the charge the trial judge referred to the

---

4. Mancuso argued in the district court that the State was collaterally estopped from litigating the constitutionality of the jury charge. In granting the writ of habeas corpus in Spagna's case, Judge Platt adopted a lengthy Report and Recommendation submitted by Magistrate A. Simon Chrein. In his Report Magistrate Chrein found that the jury instruction challenged by both Spagna and Mancuso could have been interpreted by a reasonable juror as "either requiring a conclusive presumption or as shifting the burden of persuasion upon the defendant, to prove lack of intent, both interpretations being constitutionally infirm." In his Report in Mancuso's case, Magistrate Caden did not specifically refer to the doctrine of collateral estoppel, but did state that his recommendation that the writ be granted was based on his adoption of the reasoning and conclusions reached by Magistrate Chrein in Spagna's case.

jury's duty to make findings with respect to "the defendants, either or both of them." Further, Spagna and Mancuso played different roles in the crime for which they were convicted.

It also cannot be assumed that the State has an equal incentive to vigorously litigate claims for habeas corpus brought by each of several co-defendants. Differences in culpability and in willingness to plead guilty no doubt influence the State's decisions in this regard. In *Olegario v. United States*, 629 F.2d 204, 215–216 (2d Cir. 1980), *cert. denied*, 450 U.S. 980, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981), this Court held, in another context, that a government officer, who is accorded wide discretion in determining when to file cases or pursue appeals, should not be required to seek review of cases that would not otherwise be appealed in order to prevent an adverse decision from having collateral estoppel effect in later cases. The discretionary decisions of the district attorney, which clearly are determined by a variety of factors, some of which are unrelated to the legal issues in a case, must be accorded such latitude.

■ For these reasons the State is not collaterally estopped from pursuing the instant appeal.

## II. *The Alleged Sandstrom Violation*

In *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), the Supreme Court held that a charge to a jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts," relieved the State of the burden of proof beyond a reasonable doubt on the critical question of the defendant's state of mind. The charge was therefore found to be constitutionally defective. In *Sandstrom* the trial judge had given this instruction to the jury without explanation or qualification. The jury was not told that, rather than simply presuming intent from the doing of a particular act, they should consider the other evidence in the case and the circumstances surrounding the incident in their effort to determine whether the intent necessary to convict for the crime charged was present. The instruction given in *Sandstrom* was particularly egregious since the defendant had admitted to killing the victim but contended that due to a personality disorder aggravated by alcohol consumption he did not have the intent required to support a finding of " 'deliberate homicide.' " 442 U.S. at 512, 99 S.Ct. at 2453.

■ The charge given in this case was not nearly so peremptory as that delivered in *Sandstrom*. Here the language, "[e]veryone is presumed to intend the natural consequences of his act ...", was both preceded and followed by language that served to qualify it appropriately. The broader text read:

Under the definition of felony murder, intent to kill need not be established. But, the intent to commit the underlying felony must be established.

A word about intent. Intent is a secret and silent mental operation not visible to the human eye. The way intent is determined is from the actions and the conduct of the individual whose intent is the subject of your inquiry. Everyone is presumed to intend the natural consequences of his act and unless the act is done under circumstances or conditions that might preclude the existence of such an intent, you, the jury, have to find, have the right to find the requisite intent from the proven actions of an individual. If you find from the actions of one of several participants an intent to commit a certain crime, then anyone who was a co-principal or active participant in the crime also had such intent.

The qualifying "unless" clause used here is virtually identical to that which this Court found to be both ameliorative and free of any improper burden-shifting effect in *Washington v. Harris*, 650 F.2d 447, 453 (2d Cir. 1981).

■ Further, the crime charged against Mancuso in this case was felony murder. Thus, the prosecution was not required to prove intent to kill. Rather, it satisfied its burden if it proved beyond a reasonable

doubt all of the essential elements of the underlying burglary. Thus, when in the context of his extensive instructions to the jury as to the elements of a burglary, the trial judge herein stated that "[a]ccording to the law, a person intends to commit a crime when his conscious aim or objective is to commit the crime," he instructed the jury as to intent, without charging a presumption, in the particular context in which the issue was presented.

In *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), the Supreme Court stated that a single jury instruction "may not be judged in artificial isolation, but must be viewed in the context of the overall charge," 414 U.S. at 146, 94 S.Ct. at 400, and that "[t]he question is not whether the trial court failed to isolate and cure a particular ailing instruction, but rather whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* As in our recent decision in *Nelson v. Scully*, 672 F.2d 266 (2d Cir. 1982), we find that in this case the impact of the presumption language, in the context of the entire charge, was merely to instruct the jury as to a permissible method for reaching a conclusion as to whether Mancuso had the intent required to commit the burglary upon which the felony murder charge was predicated. When viewed in this light, it is apparent that "there was [no] significant possibility that harm was done." *Id.* at 272. In reaching this conclusion we also have taken into account the circumstances and extent to which Mancuso's intent was an issue at his trial for felony murder. *See Washington v. Harris, supra,* 650 F.2d at 453. In *Sandstrom* and *Nelson*, the existence of the specific intent to kill was the principal issue before the jury. Here Mancuso denied any involvement in either the burglary or the murder. His defense focused on an attempt to discredit the witnesses who testified to his involvement in the burglary. Therefore, once the jury decided, as it clearly did, to accept the testimony of those witnesses with regard to Mancuso's involvement, and found that he was present at the scene of the crime, as

charged in the indictment herein, the one challenged instruction as to intent, in the context of a lengthy, and otherwise unassailable charge, created no "significant possibility that harm was done." *Nelson, supra,* at 272.

We find that the charge, when viewed as a whole, made it quite clear to the jury that it was to consider *all* of the evidence in the case in deciding whether the defendant possessed the intent necessary to commit the crime of burglary. The judgment of the District Court is reversed and the petition is dismissed.