**McDaniel BRAYBOY,
Petitioner-Appellant,
v.**

Charles S. **SCULLY,** Warden, Green Haven Correctional Facility, **Robert Abrams,** Attorney General, State of New York, **Carl A. Vergari,** District Attorney, Westchester County, **Respondents-Appellees.**

**No. 332, Docket 82–2150.**

United States Court of Appeals, Second Circuit.

Argued Oct. 19, 1982.

Decided Dec. 9, 1982.

Certiorari Denied March 28, 1983. See 103 S.Ct. 1505.

David Seth Michaels, New York City (The Legal Aid Society, Federal Defender Services Unit, New York City, of counsel), for petitioner-appellant.

Richard E. Weill, Asst. Dist. Atty., Westchester County, White Plains, N.Y. (Carl A. Vergari, Dist. Atty., Westchester County, Gerald D. Reilly, Asst. Dist. Atty., Westchester County, White Plains, N.Y., of counsel) for respondents-appellees.

Before OAKES and WINTER, Circuit Judges, and MacMAHON,* District Judge.

WINTER, Circuit Judge:

McDaniel Brayboy appeals from an order of the United States District Court for the Southern District of New York, Judge Abraham D. Sofaer, denying his petition for a writ of habeas corpus. Judge Sofaer granted a certificate of probable cause and Brayboy claims here, as he did below, that the writ should issue on the grounds that a pre-trial identification procedure was impermissibly suggestive and that the trial court unconstitutionally shifted the burden of proof as to criminal intent in instructing the jury. We affirm.

## I

The facts are not in dispute. Brayboy was convicted on two counts of attempted murder in the second degree after a jury trial in New York's Westchester County. Central to the prosecution's case was the identification testimony of the victim, Katherine Kolkmann. Before admitting

---

* Honorable Lloyd F. MacMahon, United States District Judge, Southern District of New York, sitting by designation.

her testimony, the trial court held a hearing to determine whether her proposed identification of Brayboy was the result of unduly suggestive methods used by the police.

That hearing revealed the following. On April 28, 1975, at approximately 10:00 p.m., a Fred Baldoni was driving Kolkmann to a friend's house in Westchester County, when a station wagon bumped Baldoni's vehicle from behind. He pulled over to inspect for damage and to talk to the driver of the wagon. After a brief conversation with the driver, Baldoni returned to his car. He leaned toward the glove compartment and left the car again. At that point, Kolkmann observed a man exit the passenger side of the station wagon and move toward her vehicle. As he approached on the passenger side, the man drew a gun and fired a shot into the car which grazed her head. As Kolkmann dove for the baseboard of the car, other shots were being fired outside. After 30 seconds, the station wagon drove away.

A three-year investigation followed, during which Kolkmann was unable to identify her assailant from police photographic files or describe him in sufficient detail to permit a police artist to draw an accurate portrait. On June 8, 1978, she was shown a photo array which included a photo of Brayboy but she made no identification. Nine days later she was driven from Yonkers to Grand Central Station. Though she had already surmised as much, she was told the purpose of the trip was to make a possible identification. When she arrived, she entered the Station through the Vanderbilt Avenue entrance and walked through the terminal. She exited at 42nd Street and proceeded west toward Vanderbilt Avenue. Petitioner was working on a scaffold located at the corner of Vanderbilt and 42nd Street. Recognizing petitioner as her assailant, she returned to the police and so informed them. They in turn drove her back by the scaffolding. While crouching in the car, she made a second identification.

On the basis of these facts, Kolkmann's identification testimony was admitted. Following her identification of Brayboy at the outset of the trial, the defense was allowed to present its evidence on the identification issue, namely, testimony that only four of the Conrail employees who work with Brayboy are black. It was also stipulated that Brayboy was 5'7" (Kolkmann had identified her assailant as approximately 5'10") and that he had perfect vision (Kolkmann had described the man who shot her as having worn slightly tinted glasses). Thereafter, the prosecution resumed its main case and offered accomplice testimony by a Thomas Hutchinson, who corroborated Kolkmann's overall story as to the events of April 28, 1975.

Brayboy was charged with two counts of attempted murder as well as the lesser included offenses of criminal assault and criminal possession of a weapon. Petitioner's principal defense was one of mistaken identification. However, he did not concede that the assailant intended to kill Kolkmann, a necessary jury finding to convict on the charge of attempted murder.

In charging the jury on the attempted murder counts, the trial judge issued the following instruction:

'Intent' is defined as follows: A person acts intentionally with respect to a result or to conduct described by a Statute defining an offense when his conscious objective is to cause such result or to engage in such conduct.

Further, I charge you that a man is deemed to intend the natural consequences of his act, and unless the act was done under circumstances or conditions which preclude the existence of such intent, you have a right to find from the result produced an intent to effect the result.

The same language was used in instructing on the attempted murder of Baldoni.

In his general instruction on intent, the trial judge stated:

Each of the charges involved here is a crime which requires the element of an intent. Proof of intent involves the operation of a person's mind. Whether the criminal intent existed at the time of the commission of the alleged criminal act

must, of necessity, be inferred and found from other facts which in their nature are the subject specific proof. And for this reason, it must ordinarily be left to the Jury to determine from all the circumstances whether the criminal intent existed. You must discover and determine intent in accordance with your own experience and understanding of how people operate. The facts of what was done, what was said, what the person's reaction was and other circumstances and surrounding facts in arriving at what you consider was the intent, you must seek to apply the facts as they appear to you to have been at the time itself. A person is ordinarily deemed to intend the natural and logical consequences of his acts.

The jury convicted Brayboy on the two counts of attempted murder, and he appealed to the Appellate Division, challenging Kolkmann's identification testimony and the charge on criminal intent. The Appellate Division affirmed the conviction without opinion. Leave to appeal to the New York Court of Appeals was subsequently denied. On October 19, 1981, Brayboy filed his petition for a writ of habeas corpus. Judge Sofaer denied the petition, concluding that the identification procedure was not prejudicially suggestive and that any error in the challenged portions of the jury instructions had been cured by ameliorative language. He also concluded that intent was not an issue "since petitioner's defense was that he was not the person who fired the gun." Memorandum and Order, No. 81–6089 at 2 (S.D.N.Y. March 26, 1982).

## II

■ Neither the identification claim nor the issue of the instruction on criminal intent warrants issuance of the writ. As to the former, the level of suggestiveness did not approach that which other courts have condemned. Although only four of Brayboy's Conrail co-workers are black, there were other black workmen in the station. In fact, of the 20 workmen viewed by Kolkmann, most were black. Moreover, Kolkmann was not directed to Brayboy in any

way other than being taken to Grand Central and did not see him until the end of her tour. Although she obviously knew she was going to Grand Central for purposes of a possible identification, such knowledge is not impermissibly suggestive. Were such knowledge alone sufficient to preclude use of the identification at trial, any procedure would be vulnerable since witnesses to a crime always know they are viewing photo arrays and line-ups in order to make a possible identification. In the present case, both the state trial judge and Judge Sofaer found that Kolkmann knew only that she might make an identification and had not been told that her assailant was definitely in the station.

In contrast to the facts here, the decisions finding impermissible suggestiveness involved identifications in which a suspect simply stood alone or in which a single photograph was shown to a witness, *see Manson v. Brathwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977) (single photo); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) (single show-up); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967) (single show-up in hospital room); *Styers v. Smith,* 659 F.2d 293 (2d Cir.1981) (single show-up), or procedures in which witnesses viewed the suspect prior to the line-up or the line-up or photo array singled out one person, *see Jackson v. Fogg,* 589 F.2d 108 (2d Cir.1978) (suspect marched by witness in stationhouse before being viewed in line-up); *Styers v. Smith, supra* (photo array contained two color photos of the two suspects along with black and white mug shots of other non-suspects). In contrast, Kolkmann's "array" at Grand Central was quite large and she was not prejudiced by any prior police designation of Brayboy.

■ Since the identification procedure was not impermissibly suggestive, the issue of the reliability of Kolkmann's identification of Brayboy is not before us. *See Neil v. Biggers, supra.* Even if it were, however, her inability to pick Brayboy from a photo array or describe him to a police artist is not dispositive evidence of the unreliability of her trial testimony. To the

contrary, these facts can be viewed as evidence of Kolkmann's cautious approach to the identification. Moreover, the trial court found that the array photo did not resemble Brayboy and Kolkmann had earlier complained of her difficulty in verbalizing descriptions of people.

■ As to the issue of the instructions on criminal intent, Brayboy contends they impermissibly shifted the burden of proof under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). This issue must be addressed on the merits since Brayboy was charged with a series of lesser included offenses with differing requirements of criminal intent, and the trial judge instructed the jury not to consider the lesser offenses unless it acquitted on the higher. Moreover, the facts were not such that the jury, once having resolved the identification issue against Brayboy, would inexorably find criminal intent. *Compare Dudley v. Dalsheim,* 686 F.2d 110 (2d Cir. 1982) (per curiam) (defense of mistaken identification in a case of plainly intentional shooting at point blank range). If the charge was error, therefore, it was not harmless.

■ However, reading the charge as a whole, *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973), the *Sandstrom* claim must be rejected. The challenged language, "a man is deemed to intend the natural consequences of his acts," was used three times. On two of those occasions language virtually identical to that we have deemed curative in other cases immediately followed. *Mancuso v. Harris,* 677 F.2d 206, 210 (2d Cir.1982), ("unless the act is done under circumstances or conditions that might preclude the existence of such an intent"); *Washington v. Harris,* 650 F.2d 447, 452–53 (2d Cir.1981) *cert. denied,* 455 U.S. 951, 102 S.Ct. 1455, 71 L.Ed.2d 666 (1982) ("unless the contrary appears from the evidence"). Here, the same qualifying language was used on all but the third occasion.

On that occasion, the supposedly offending language was in a sentence concluding two full paragraphs on the general issue of proof of criminal intent. The preceding instructions made it clear beyond cavil that criminal intent was not to be "presumed" from the proven acts of the defendant as in *Sandstrom* but was "left to the Jury" to be "inferred and found" from "all the circumstances" and "surrounding facts" in light of the jury's "own experience and understanding of how people operate." The context of the final sentence thus utterly contradicts any supposed shifting of the burden as to criminal intent. In that context, the words "deemed to intend the natural and logical consequences of his acts" merely informed the jury that a person's acts are relevant in a common sense way to his or her intent. Since other instructions specifically stated that the burden of persuasion was on the prosecution as to all elements of the crimes charged, the jury could not have been misled by the challenged language.

Affirmed.

OAKES, Circuit Judge (concurring):

My problem lies not so much with the court's opinion, but with the law of the circuit. As I suggested in dissent in *Rivera v. Coombe,* 683 F.2d 697, 702, 703 & n. 1 (2d Cir.1982), arguably the clause found improper in the charge in *United States v. Robinson,* 545 F.2d 301 (2d Cir.1976)—unless the contrary appears from the evidence"[1] —is not meaningfully different from the "ameliorative" clause found proper in *Washington v. Harris,* 650 F.2d 447 (2d Cir. 1981), *Mancuso v. Harris,* 677 F.2d 206 (2d Cir.1982), *Rivera,* and this case—"unless the act is done under circumstances or conditions that might preclude the existence of such intent." I say the clauses are not genuinely different because *Sandstrom* was concerned with the perceptions of a reasonable juror and with what a reasonable juror could have assumed the instructions to mean. *Sandstrom v. Montana,* 442 U.S.

---

1. *See also United States v. Barash,* 365 F.2d 395, 402–03 (2d Cir.1966). Judge Friendly's opinion there goes further to invalidate a *Sand-*

*strom*-type charge than any other case in the Circuit, though not explicitly on constitutional grounds.

510, 515, 519, 99 S.Ct. 2450, 2454, 2457, 61 L.Ed.2d 39 (1979). I do not see how a reasonable juror could distinguish between the two "unless" clauses, even though the "unless" clause relating to "evidence" was found by the *Robinson* panel to be burden-shifting and unacceptable while the "unless" clause referring to "circumstances" was found in *Washington, Mancuso* and *Rivera* to be "ameliorative." Moreover, the impermissible language in this case when first charged was not followed by the "ameliorative" clause, though it was preceded by the language quoted in Judge Winter's opinion.

Having said all this, the allegedly offending language of the charge in the instant case was in the first instance "a man is ordinarily deemed to intend the natural and logical consequences of his acts." The use of the word "ordinarily" means that there are cases in which he is *not* deemed to intend, and the use of the word "deemed," I suspect, means to the layman something more equivocal than the word "presumed," or "our law says" or the like. This is true I think despite the fact that lawyers or judges may, as this court did some time ago in a case involving statutory construction, *Douglas v. Edwards,* 298 F. 229, 237 (2d Cir.1924), give the word "deemed" a more conclusive effect than the word "presumed." [2] In any event the coupling of the words "ordinarily deemed" is probably more qualified than the language in other *Sandstrom* cases and it therefore permits more readily the *Cupp v. Naughten* analysis of, e.g., *Nelson v. Scully,* 672 F.2d 266 (2d Cir. 1982). The other two mentions of the offending presumption omit the word "ordinarily" but use the word "deemed" in conjunction with the "ameliorative" clause of *Mancuso v. Harris.* While I have serious doubts in light of *Robinson* I suppose *Mancuso* at least is the present law of the circuit.

I concur, then, with some hesitation and a certain reluctance, trusting that, since our court has not seen fit to decide any *Sandstrom* case *en banc,* the Supreme Court may shed further light in *Connecticut v. Johnson,* 188 Conn. 515, 450 A.2d 361 (1981), *cert. granted,* 455 U.S. 937, 102 S.Ct. 1426, 71 L.Ed.2d 647 (1982).

---

**2.** I note also that in another portion of the charge given in this case, the trial court equated "presume" with "infer" which may take away to some extent from my argument. Again, however, the trial court was in my view taking the legalistic rather than the lay version of the meaning of the words.