384 S.E.2d 347

**STATE of West Virginia**

v.

**Bobby Dean STACY.**

No. 18571.

Supreme Court of Appeals of
West Virginia.

July 21, 1989.

Frank W. Helvey, Jr., Public Legal Services, for Bobby Dean Stacy.

Jeffrey L. Hall, Asst. Atty. Gen., Charleston, for the State.

WORKMAN, Justice:

This case is before the Court upon an appeal by Bobby Dean Stacy (Stacy). It arises from the defendant's July 27, 1982, felony-murder conviction by a jury [1] in the Circuit Court of Cabell County. The defendant was sentenced to life imprisonment without mercy for the December 14, 1981 murder of Huntington Police Officer Paul J. Harmon (Harmon). The assignments of error made by the defendant include: 1) the trial court erred in instructing the jury on felony-murder without also instructing on each essential element of the underlying felony and without instructing on the State's burden of proof in the underlying felony; 2) the trial court erred in permitting the in-court identifications of the defendant because the out-of-court photographic arrays used to identify the defendant were so suggestive they impermissibly tainted all in-court identifications; 3) the trial court erred in failing to suppress evidence obtained from the warrantless search of the locked trunk compartment of the defendant's car; and, 4) the trial court erred in failing to admonish the prosecutor and failing to give jury instructions to cure the prejudice created by the prosecutor's improper remarks during closing argument.[2] We conclude that the lower court erred in its instruction to the jury on felony-murder and reverse and remand.

On December 14, 1981, at 1:15 a.m., two men attempted to rob a McDonald's restaurant in Chesapeake, Ohio. Both men wore dark blue or black ski masks which covered their faces. Maurice McCoy, an employee for McDonald's indicated that one of the men was approximately six feet tall while the other was short and fat. The tall man was identified as being white while the short man was identified as being black. Carrying sawed-off shotguns, the masked men confronted McCoy and another McDonald's employee and demanded that the employees give them the combination to the restaurant's safe. When the employees informed the robbers they did not know the combination, the two robbers took the keys to a 1972 Matador belonging to one of the employees and fled the scene at approximately 1:20 a.m. The employee's car was later found in Huntington, West Virginia, some ten blocks from where Officer Har-

---

1. The jury was impaneled in Grant County, West Virginia, then transported to Cabell County to avoid the potential jury members being prejudiced against the defendant due to substantial pretrial publicity.

2. Concerning assignments of error three (3) and four (4), upon review of the record, we find no merit to either assignment and therefore do not address them.

mon was murdered. A tape deck and some eight-track cassettes were missing from the stolen vehicle.

At 1:41 a.m., some twenty minutes after the McDonald's robbery, Officer Randy Byard (Byard) of the Huntington Police Department, observing a possible breaking and entering by two men at a gasoline station, radioed for the assistance of a back-up unit. Officer Harmon responded to the back-up request and a short time later, he radioed to Officer Byard "[Byard], I've got 'em over here at 19th and—uh—Jefferson." A few seconds later, Officer Byard reported hearing a gun shot and rushed to Officer Harmon's aid. Officer Byard heard four more gun shots and saw two men running west down Jefferson Avenue in Huntington. When the officer arrived at the corner of Jefferson Avenue and 19th Street, he found the body of Officer Harmon. Harmon had been beaten in the head and shot five times. Officer Harmon's service revolver and flashlight were missing. Officer Byard then observed two men get into a green 1971 Buick Skylark and leave the scene.

One of the witnesses, Ted Norman (Norman), a seventy-seven year old man, lived at 1907 Jefferson Avenue, the third house from the intersection at 19th Street and Jefferson Avenue. Norman testified that he heard a gunshot, looked out his window, and saw Officer Harmon on the ground with the man on top of him trying to take something from the officer. The man then raised up and shot Officer Harmon several more times. Norman further testified that the man got up and ran towards his home and as the man approached, Norman turned on his porch light and clearly saw the man from a distance of eight to twelve feet. Norman identified Stacy as the man who shot Officer Harmon and ran past his home.

Angela Kay Norman (Angela), Ted Norman's ten-year-old granddaughter, also testified that she saw a man shoot Officer Harmon and then run by the side of their house. As the man passed her home, Angela said he looked up and "squinched his eyes." Norman testified that the as-sailant may have been wearing a wig, while Angela was certain that the man had on a wig. She also later identified Stacy as the assailant.

Shortly after the shooting, Officer Leroy Campbell (Campbell) of the Kenova Police Department passed a car travelling west on U.S. Route 60. Officer Campbell turned around and followed the vehicle because it was being driven by a black man and as the officer stated at trial "[t]here's no—there's no black people in our community at all, and when I first seen [sic] this I was going to check this out." As the officer passed the vehicle, the driver turned his head toward Officer Campbell for a couple of seconds. Officer Campbell later identified Wilbert Mayle (Mayle), Stacy's co-defendant, as the driver of the car. At about this time, Officer Campbell learned of the shooting of Officer Harmon over his radio. The officer received a description of the car which had fled the murder scene and realized that the car he had just passed fit that description. Officer Campbell proceeded to establish a roadblock at the Kenova–Catlettsburg bridge on Route 60. The suspect vehicle, however, averted the roadblock by turning left prior to reaching the bridge. The officer followed the suspect car and found it abandoned on Sycamore Street, a dead-end street by the river.

The car was registered in the name of Bobby Dean Stacy. Officer Harmon's service revolver, which was used to kill him, was found on the front passenger's seat. Other items removed from the car and subsequently introduced into evidence at trial included a deck of playing cards and the car's steering wheel, each bearing a fingerprint identified as Mayle's; a plastic bag bearing one fingerprint identified as Stacy's; an envelope, also with one of Stacy's fingerprints; a loaded .357 Magnum taken from a suitcase on the rear seat; two ski masks, one of which contained hair fibers consistent with hair samples of Stacy and co-defendant Mayle; an eight-track deck removed from the locked trunk compartment and identified as having been taken from the car stolen from the manager of the Ohio McDonald's; and, nineteen eight-track tapes found on the rear seat, six of

which were claimed to have been taken from the vehicle stolen in Ohio. Three of the six tapes bore fingerprints identified as Stacy's.

The State also produced evidence to suggest that after Stacy and Mayle had abandoned their car on Sycamore Street, they stole a pickup truck from a residence some six miles away which police later discovered abandoned near Fort Gay, West Virginia. In Fort Gay, another truck was reported stolen. This truck allegedly carried Mayle and Stacy approximately three-fourths of a mile to a Pic–Pak store in Louisa, Kentucky. At the Pic–Pak store, bread salesman Hiram Adkins (Adkins) saw two individuals at 10:15 a.m. on December 14, 1981. Based upon his view of these two men, Adkins identified Stacy in court as one of the individuals he saw that morning. The second stolen truck was later found abandoned in Columbus, Ohio, approximately a block and a half from Stacy's mother's home.

Kathy Pearson (Pearson), a resident of Columbus Ohio, was a friend of both Mayle and Stacy. Pearson testified that on the evening of December 13, 1981, Stacy called her and told her that "he was going to meet Jackie and go to the hills and take care of business." She identified "Jackie" as being Wilbert Mayle. Additionally, Pearson testified that she had a phone conversation with Stacy on December 15, 1981. She asked Stacy, "Bob, did you shoot somebody?" She said Stacy replied, "Kathy, it's worse than that."

At trial, Stacy's defense centered on newspaper and television reports of Harmon's murder and out-of-court identifications of Stacy by the State's witnesses which were allegedly suggestive in nature and led the prosecution's witnesses to wrongly identify Stacy as Paul Harmon's assailant.

At the close of all the evidence, the jury found Stacy guilty of first degree murder with no recommendation for mercy.

## FELONY–MURDER JURY INSTRUCTION

The defendant's first assignment of error involves the instructions given to the jury regarding felony-murder.[3] The State's case was based on the theory that Stacy and Mayle, working together, first attempted an armed robbery of the McDonald's in Ohio on the morning of December 14, 1981. The two men then stole a car belonging to one of the McDonald's employees and travelled to the nine hundred block of Fifth Avenue West in Huntington. A tape deck and several eight-track tapes were removed from the stolen car and were later discovered in Stacy's vehicle. While walking from the abandoned stolen car to Stacy's car, which had earlier been parked in the nineteen hundred block of Jefferson Avenue, Mayle and Stacy encountered Officer Harmon who was involved in a police stake-out of a possible breaking and entering at a gasoline station nearby. In order to escape, either Mayle or Stacy beat Office Harmon with his own flashlight, and then

**3.** We do recognize that this Court has previously addressed the propriety of the trial court giving the following felony-murder jury instruction in the trial of Stacy's co-defendant, Wilbert Mayle. The instruction in the Mayle case provided in part:

> Therefore, it [sic] you believe from the evidence beyond a reasonable doubt that the defendant, Wilbert Mayle, on the 14th day of December, 1981, committed a robbery or attempted robbery at the McDonald's Restaurant in Lawrence County, Ohio, and further that during his flight from McDonald's, Paul J. Harmon was killed by either Wilbert Mayle or Bobby Dean Stacey [sic] in order to prevent detection or promote escape, then you shall find Wilbert Mayle guilty of murder in

the first degree as applied by felony-murder rule.

In *State v. Mayle,* 178 W. Va. 26, 357 S.E.2d 219 (1987), we upheld the above-stated jury instruction on the basis that the felony-murder rule was properly applied in that case. It is important to note that the defendant in the *Mayle* case did not assign as error the fact that the trial court did not properly instruct the jury as to the underlying felony. "Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived." Syl.Pt. 6, *Addair v. Bryant,* 168 W. Va. 306, 284 S.E.2d 374, 376 (1981). Finally, the trial court in *Mayle* at least instructed the jury that the State had the constitutional duty of proving felony-murder beyond a reasonable doubt.

Stacy shot him five times with his service revolver.

Based on this theory presented by the State, the following jury instructions were given:

State's Instruction No. 5:

The Court instructs the jury that murder by poison, lying in wait, imprisonment, starving, or any wilful, deliberate and premediated [sic] killing, or in the commission of or attempt to commit robbery is murder of the first degree.

State's Instruction No. 8:

The Court instructs the jury that the crime of felony-murder in this State does not require proof of the elements of malice, premeditation or specific intent to kill. It is deemed sufficient if the homicide occurs, even accidentally, during the commission of or the attempt to commit robbery.

The Court further instructs the jury that the felony-murder rule applies where the initial robbery or attempt to commit robbery and the homicide were parts of one continuous transaction, and were closely related in point of time, place and causual [sic] connection, as where the killing was done in flight from the scene of the robbery to prevent detection or promote escape.

Therefore, if you find the defendant, Bobby Dean Stacy, robbed or attempted to rob the McDonald's in Ohio, and that during his flight from McDonalds [sic], Paul J. Harmon was killed by Bobby Dean Stacy in order to prevent detection or promote escape, then you may find Bobby Dean Stacy guilty of first degree murder as applied by the felony murder [sic] rule.

The defendant contends it was reversible error for the trial court to instruct the jury on felony-murder without also instructing on each essential element of the underlying felony of robbery and on the State's burden of proving the underlying felony beyond a reasonable doubt. The State argues that even though the trial court failed to properly instruct the jury on the State's burden of proving its case beyond a reasonable doubt with these two instructions, the trial court did repeatedly instruct the jury that the State must prove its case against Stacy beyond a reasonable doubt.[4] Furthermore, the State contends that the two instructions concerning the felony-murder rule are proper statements of law.

The general rule in West Virginia is that "[a]n instruction to the jury is proper if it is a correct statement of the law and if sufficient evidence has been offered at trial to support it." *State v. Hall*, 171 W.Va. 212, 222, 298 S.E.2d 246, 255 (1982); *See also State v. Shaffer*, 138 W.Va. 197, 75 S.E.2d 217 (1953); *State v. Painter*, 135 W.Va. 106, 63 S.E.2d 86, 96 (1950). The instruc-

---

4. The court's instruction No. 2 provides in part:

It is not required that the State of West Virginia prove guilt beyond all possible doubt. The test is one of reasonable doubt. A reasonable doubt is a doubt based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act. Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it.

The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture.

The burden is always upon the prosecution to prove guilt beyond a reasonable doubt. This burden never shifts to the defendant; for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

So if the jury, after careful and impartial consideration of all the evidence in this case, has a reasonable doubt that the defendant is guilty of the charge, it must acquit. If the jury views the evidence in the case as reasonably permitting either of two conclusions— one of innocence, the other of guilt—the jury should, of course, adopt the conclusion of innocence.

The only other mention of proof beyond a reasonable doubt came in the Court's Instructions Nos. 6 and 7. Court's Instruction No. 6 provided in part:

Upon the trial of a criminal case by a jury the law requires the concurrence of all twelve jurors in the conclusion of guilt before conviction can be had; each individual juror should be satisfied beyond a reasonable doubt of the guilt of the accused before he or she should consent to a verdict of guilty....

Court's Instruction No. 7 provided in part:

One of the most important issues in this case is the identification of the defendant as the perpetrator of the crime. The State of West Virginia has the burden of proving identity, beyond a reasonable doubt....

tions given to the jury in this case cannot be considered to be proper statements of the law. Even though the defendant at trial failed to object to the instructions which are now at issue, "[i]n this jurisdiction it has been established that the giving of an erroneous instruction raises a presumption of prejudice." *State v. Romine*, 166 W.Va. 135, 272 S.E.2d 680, 682 (1980); *See State v. Mason*, 162 W.Va. 297, 249 S.E.2d 793 (1978). As stated in *Romine*, "[i]t clearly follows that if the court's instructions are erroneous as to the law the jury's ultimate finding will likely be erroneous. Therefore, it is imperative that the court's instructions properly inform the jury of the applicable law." 166 W.Va. at ——, 272 S.E.2d at 682.

Rule 52(b) of the *West Virginia Rules of Criminal Procedure* provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." [5] The plain error doctrine "enables this Court to take notice of error, including instructional error occurring during the proceedings, even though such error was not brought to the attention of the trial court." *State v. England*, 180 W.Va. 342, 376 S.E.2d 548, 554 (1988). Even though this Court will not "ordinarily recognize plain error ... even of constitutional magnitude, where the giving of the erroneous instruction did not substantially impair the truth-finding function of the trial," in this case it is clear that the lower court's failure to properly instruct the jury as to the state's constitutional duty in proving the elements of the underlying felony in felony-murder substantially impaired the truth-finding function at trial and constitutes reversible error. *State v. Armstrong*, 179 W.Va. 435, 369 S.E.2d 870, 880–81 (1988) (citing Syl.Pt. 2, *State v. Hutchinson*, 176 W.Va. 172, 342 S.E.2d 138, 139 (1986)); *See also* Syl.Pt. 18, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445, 449 (1974).

The reason we find the instructions given in this case to be erroneous is that the instructions failed to inform the jury that the State had the burden of proving all the elements of the underlying felony involved in felony-murder.

*W.Va.Code* § 61–2–1 [1987] defines felony-murder as "[m]urder ... in the commission of, or attempt to commit, arson, sexual assault, robbery or burglary...." Further, in Syl.Pt. 7, *State v. Sims*, 162 W.Va. 212, 248 S.E.2d 834, 836 (1978) this Court held that:

> The crime of felony-murder in this State does not require proof of the elements of malice, premeditation or specific intent to kill. It is deemed sufficient if the homicide occurs accidentally during the commission, or the attempt to commit, one of the enumerated felonies.

To obtain a conviction under the felony-murder portion of *Code*, 61–2–1, the State is required to prove

> (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt.

*State v. Williams*, 172 W.Va. 295, 311, 305 S.E.2d 251, 267 (1983).

While we have never addressed the issue of whether the jury must be specifically instructed as to the elements of the underlying felony in felony-murder cases, we have previously held

> [i]n a criminal prosecution, the State is required to prove beyond a reasonable doubt every material element of the crime with which the defendant is charged, and it is error for the court to instruct the jury in such a manner as to

---

5. Compare with *W.Va.R.Crim.P.* 30 which provides that

> [no] party may assign as error the giving or the refusal to give an instruction or to the giving of any portion of the charge unless he objects thereto before the arguments to the jury are begun, stating distinctly the matter to which he objects and the grounds of his objection; but the court or any appellate court may, in the interest of justice, notice plain error in the giving or refusal to give an instruction, whether or not it has been made the subject of objection.

require it to accept a presumption as proof beyond a reasonable doubt of any material element of the crime with which the defendant is charged....

Syl.Pt. 4, *State v. Pendry,* 159 W.Va. 738, 227 S.E.2d 210, 213 (1976), *overruled in part on other grounds, Jones v. Warden, West Virginia Penitentiary,* 161 W.Va. 168, 241 S.E.2d 914 (1978), *cert. denied,* 439 U.S. 830, 99 S.Ct. 107, 58 L.Ed.2d 125 (1978). *See State v. Sanders* 161 W.Va. 399, 242 S.E.2d 554, 555–56 (1978), *overruled in part on other grounds, State ex rel. White v. Mohn,* 168 W.Va. 211, 283 S.E.2d 914 (1981). Further, in two cases which were previously before this Court involving felony-murder, the trial court did instruct the jury regarding the underlying felony involved. *See State v. Humphrey,* 177 W.Va. 264, 351 S.E.2d 613, 620 (1986); *State v. Young,* 173 W.Va. 1, 311 S.E.2d 118, 133 (1983).[6]

Similar cases before courts in other jurisdictions involving felony-murder have alluded to the fact that the jury was instructed as to the underlying felony. *See Mancuso v. Harris,* 677 F.2d 206, 210–11 (2d Cir.1982), *cert. denied,* 459 U.S. 1019, 103 S.Ct. 382, 74 L.Ed.2d 514 (1982); *Duffy v. State,* 146 Ga.App. 400, 246 S.E.2d 420 (1978); *People v. Thomas,* 49 Ill.App.3d 961, 7 Ill.Dec. 480, 488–89, 364 N.E.2d 641, 649–50 (1977); *Pruett v. State,* 250 Ind. 359, 234 N.E.2d 501, 504 (1968); *People v. Heard,* 103 Mich.App. 571, 303 N.W.2d 240, 242 (1981); *State v. Bowman,* 165 N.J.Super. 531, 398 A.2d 908, 911 (1979); *People v. Jordan,* 143 A.D.2d 367, 532 N.Y.S.2d 409, 410 (1988); *Irvin v. State,* 617 P.2d 588, 597 (Okla.Crim.1980).

Other courts have specifically held that failure to instruct the jury as to the under-lying felony constitutes reversible error. *See United States v. Williams,* 463 F.2d 958, 962 (D.C.Cir.1972); *Robles v. State,* 188 So.2d 789, 793 (Fla.1966); *People v. Mosley,* 72 Mich.App. 289, 249 N.W.2d 393, 395 (1976), *cert. denied,* 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977); *Commonwealth v. Shadron,* 471 Pa. 461, 370 A.2d 697 (1977); *Johnson v. Commonwealth,* 221 Va. 736, 273 S.E.2d 784, 787 (1981), *cert. denied,* 454 U.S. 920, 102 S.Ct. 422, 70 L.Ed.2d 231 (1981).

For instance, in the *Williams* case, the government utilized a felony-murder theory where the underlying felony was attempted robbery while armed. The defendant contended that the lower court erred in failing to instruct as to the elements of attempted armed robbery. *Williams,* 463 F.2d at 960. The court found that nowhere in the instructions given were the essential elements of attempted robbery, the underlying felony upon which the defendant's felony-murder conviction was based. *Id.* at 962. Consequently, the court held that it " 'placed great importance upon the manner in which a jury is instructed as to the elements of a crime. We have held that any omission of an element of a crime in the instructions to the jury is plain error....' " *Id.* (citations omitted). Further, the Michigan Court of Appeals in *Mosley* addressing the same issue held that

[e]ven absent any objection, if commission of the underlying felony is substantially in issue, it is incumbent upon the court to instruct on its elements. Failure to so instruct may constitute manifest injustice.

249 N.W.2d at 395 (citations omitted).

It is unquestionable that the commission of the underlying felony was substantially

---

**6.** Both *Young* and *Humphrey* were felony-murder cases in which the underlying felony was, as in this case, robbery. The specific instruction given in *Humphrey* was as follows:

> State's Instruction No. 2 states: 'The court instructs the jury that robbery is defined as the felonious taking of money or goods of value from the person of another or from his presence against his will, by force or by putting him in fear.'

177 W.Va. at 272, n. 10, 351 S.E.2d at 620, n. 10. Likewise, the instruction given in *Young* was as follows:

> State's Instruction No. 4 provides: The Court instructs the jury that robbery is committed when one person takes or attempts to take from the person or from the presence of another any property or money or any other thing of value belonging to or in the care, custody, control, management, or possession of such person by force or violence or by putting such person in fear.

173 W.Va. at 16, n. 11, 311 S.E.2d at 134, n. 11.

at issue in this case. Although there was circumstantial evidence presented at trial which connected the defendant to the robbery at the McDonald's in Ohio, there was no witness that could identify the defendant as the person who committed that robbery. Further, the State centered its case around the felony-murder rule, thereby placing the underlying felony substantially at issue. Thus, under the court's rationale in *Mosley*, the lower court in the present case should have instructed the jury regarding the underlying felony.

Finally, we have held that robbery is a lesser included offense of felony-murder and that " '[i]t has always been the law that a person cannot be punished for both a lesser included offense and the greater crime when the elements of the first are necessarily included in the elements of the second. (citations omitted).' " *State ex rel. Hall v. Strickler*, 168 W.Va. 496, 285 S.E.2d 143, 144 (1981); (citing *State ex rel. Johnson v. Hamilton*, 164 W.Va. 682, 266 S.E.2d 125, 128–29 (1980), *cert. denied*, 449 U.S. 1036, 101 S.Ct. 613, 66 L.Ed.2d 498 (1980), *overruled in part on other grounds, State ex rel. Watson v. Ferguson*, 166 W.Va. 337, 274 S.E.2d 440 (1980). *See also Williams*, 172 W.Va. at 310–12, 305 S.E.2d at 251, 266–68. It necessarily follows that since the underlying felony is an essential element of felony-murder, the jury, in order to convict a person of felony-murder, must be informed of what constitutes the underlying felony. The only logical way to accomplish this is to instruct the jury as to the elements of the underlying felony. This simply was not done in this case.

We reverse based on the defendant's primary assignment of error regarding the insufficiency of jury instructions given at trial. We address the next assignment of error in order to give guidance to the trial court upon retrial.

IN–COURT IDENTIFICATIONS

The defendant's second assignment of error involved the suggestive out-of-court photographic arrays used to identify the defendant. The issue is whether these photo arrays were so suggestive as to impermissibly taint the witnesses' in-court identifications.

The in-court identifications at issue involve the ones made by Ted Norman, Angela Norman, and Hiram Adkins. In order to determine whether the in-court identifications were impermissibly tainted by the out-of-court identifications, it is helpful to review the circumstances under which the out-of-court identifications were made by the witnesses.[7]

Ted Norman, an eyewitness to the attack on Officer Harmon, was presented with a photo array on the evening of December 16, 1981. While Norman testified that the array consisted of a "bunch" of pictures, Officer Bobby Stevens testified that it would have been "[s]ix to seven or eight to ten, possibly." Norman, although indicating to the officer that the photograph of Stacy looked like Harmon's assailant, could not give a positive identification to the officer. Since no positive identification was made, the police department, unfortunately, failed to keep the array shown to Norman. Then, on December 17, Officer Angelo Gill showed Norman a videotape of the defendant obtained from a Columbus, Ohio television station. The contents of the videotape were unrelated to the Huntington homicide. The videotape initially shows heavily armed police involved in a large scale manhunt involving police dogs and helicopters. The next portion of the tape is of Stacy in a blue jail uniform with handcuffs being removed from his wrists. Norman was shown the entire videotape without sound. Upon seeing the videotape tape, Norman did identify the man in the videotape (the defendant in this case) as Harmon's assailant.

7. The lower court, after conducting a suppression hearing, did exclude the out-of-court identifications made by each of the three witnesses mentioned above. The court further found that although the prosecution could not bring up the out-of-court identification during its case-in-chief, the defendant could bring it out if he so desired. Finally, the lower court found that the out-of-court identifications did not impermissibly taint the in-court identifications of the defendant which each of the three witnesses did indeed make at trial.

Angela Norman was also an eyewitness to officer Harmon's murder. She did identify Stacy as the person who assailed Officer Harmon, but only after she saw Stacy's picture on the news,[8] indicating to her grandfather that the man shown on the newscast (Stacy) was the one who killed the police officer.

Finally, Hiram Adkins, who testified to seeing Stacy at a Pic–Pac store in Louisa, Kentucky, was shown a blurry xerox photograph of Stacy by police from which he was unable to identify the man he saw. Later, he was shown a photo array[9] from which he did positively identify Stacy as the man he saw in the Pic–Pac store. Adkins testified that the array contained no pictures of individuals with characteristics similar to those of the defendant. There was, however, conflicting testimony between Adkins and the officer who conducted the photo array. The officer testified he handed the photos to Adkins, while Adkins testified that the officer spread the photos out on a table. There was also a question as to how many photographs were actually shown to Adkins.[10]

The defendant contends that the out-of-court photographic arrays used to identify the defendant were so suggestive that they impermissibly tainted all in-court identifications made by each of the three witnesses. The State, however, contends that the identifications made by these three individuals were based upon their observations of Stacy at the scene of the crime or at a point of time during Stacy's flight from the murder.

■ This Court has previously held that "suggestive procedures *alone* should not be the basis of excluding an otherwise totally reliable identification...." *State v. Boyd,* 167 W.Va. 385, 280 S.E.2d 669, 678–79 (1981) (citing *State v. Kennedy,* 162 W.Va. 244, 249 S.E.2d 188, 190–91 (1978)) (emphasis in original). However, "convic-tions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside ... if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *See also Kennedy,* 162 W.Va. at 247–48, 249 S.E.2d at 190.

In determining whether an out-of-court identification of a defendant is so tainted as to require suppression of an in-court identification a court must look to the totality of the circumstances and determine whether the identification was reliable, even though the confrontation procedure was suggestive, with due regard given to such factors as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Syl.Pt. 3, *State v. Casdorph,* 159 W.Va. 909, 230 S.E.2d 476, 478 (1976); *See State v. Massey,* 178 W.Va. 427, 435, 359 S.E.2d 865, 873 (1987); *See also Manson v. Brathwaite,* 432 U.S. 98, 114–16, 97 S.Ct. 2243, 2253–54, 53 L.Ed.2d 140 (1977); *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382–383, 34 L.Ed.2d 401 (1972).

We now apply the above criteria to the facts in the present case:

1) *The opportunity of the witness to view the criminal at the time of the crime.* Ted Norman testified to seeing the assailant for a few seconds, from a distance of between eight to twelve feet, when the man passed by the end of Norman's porch. Angela Norman also testified that she viewed the assailant for a

---

**8.** Angela Norman, upon cross examination, did testify that not only did the newscast reveal a picture of the defendant, but referred to Stacy as the man wanted for the killing of Officer Harmon.

**9.** The photo array shown to Adkins was retained by the police.

**10.** Adkins testified he was originally shown fifteen (15) to twenty (20) photographs; however, the photo array introduced in evidence at trial by the defendant contained only seven (7) photographs.

period of three minutes or less as he passed by the porch, although she was uncertain exactly how long she observed him. She also saw the man from about the same distance as her grandfather. Adkins saw the assailant at a different location, a Pic–Pak store, where he passed within two feet of the man. Both of the Normans testified that they observed the assailant in a well-lit area since their front porch light was on. Adkins also testified that the lighting at the Pic–Pak store was good.

2) *The witness' degree of attention.* It would appear from the testimony of both Ted Norman and Angela Norman that their degree of attention was great. Norman saw Officer Harmon and his assailant struggling and then observed the assailant actually shoot the officer. Angela saw the two men struggling and heard the gun shots. Both of the Normans observed the assailant come toward their home and pass by the front porch. Adkins paid close attention to the man he later identified as Stacy because he was muddy and wet when he saw him at the store.

3) *The accuracy of the witness' prior description of the criminal.* Norman described Harmon's assailant as wearing a grey checkered plaid jacket, with fuzzy dark brown hair. He indicated that the man was about five foot nine inches in height. Angela described the assailant as wearing a red plaid jacket and wearing a brownish-black wig. She indicated that she got a good look at the man's face. Adkins described the man he saw as having medium length hair. The man was wearing work shoes but Adkins couldn't remember exactly how he was dressed, only that his work shoes were completely covered with mud. The man, according to Adkins, was not wearing a jacket.

4) *The level of certainty demonstrated by the witness at the confrontation.* Norman originally was not able to identify the defendant as the assailant from a photo array. However, both Angela and Adkins

were able to positively identify Stacy from photographs. All three witnesses positively identified the defendant at trial and all three seemed certain of their identifications even during cross-examination.

5) *The length of time between the crime and the confrontation.* Ted Norman identified Stacy from a highly suggestive videotape three days after the crime occurred and after an unsuccessful attempt to identify him from a photo array. Angela identified Stacy as the assailant from a photograph presented to her by police within approximately a day after the incident, although the record is somewhat unclear on this point. She had seen pictures of Stacy on television prior to the identification. Adkins identified the man he saw at the Pic–Pak store as Stacy three days after he observed him at the store.

Based on the above criteria, we find that Ted Norman's in-court identification of Stacy as the assailant, although having certain aspects of reliability, when weighed against the suggestive procedure involving the observation of the videotape of Stacy in handcuffs and prison clothing, must be excluded since there was a "substantial likelihood of irreparable misidentification." *Kennedy,* 162 W.Va. at 248, 249 S.E.2d at 190 (quoting *Simmons,* 390 U.S. at 384, 88 S.Ct. at 971)[11] The likelihood of irreparable misidentification is especially great in Norman's case, since he was unable to positively identify Stacy as the assailant prior to viewing the videotape. This exclusion of Norman's in-court identification does not preclude him from testifying about what he reliably observed.

Regarding Angela Norman's and Hiram Adkins' in-court identifications, we find, based on the "totality of circumstances" surrounding their identifications, that a "substantial likelihood of misidentification" is not present. *Id.* This is based upon not only their own independent observations of the defendant, and the conditions under which those observations took place,

---

11. *But see State v. Gravely,* 171 W.Va. 428, 299 S.E.2d 375 (1982) in which this Court held that an identification of defendant made by crime victim in the courthouse basement, though sug-

gestive, did not impermissibly taint crime victim's in-court identification so as to render it inadmissable.

but also because each of these witnesses were subject to cross-examination which failed to weaken their certainty in identifying the right person in court. Thus, their out-of-court identifications, though properly excluded, were not so tainted as to merit the trial court precluding either of these two witnesses in-court identifications of the defendant. In the case of these two witnesses,

> '[w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill. Juries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature.'

*State v. Boykins*, 173 W.Va. 761, 320 S.E.2d 134, 139 (1984) (quoting *Manson*, 432 U.S. at 116, 97 S.Ct. at 2254).

For the reasons stated above, the judgment of the Circuit Court of Cabell County is reversed and the case is remanded for a new trial to be conducted in accordance with this opinion.

Reversed and remanded.

BROTHERTON, Chief Justice, dissenting:

I strongly dissent from the majority opinion reversing the felony-murder conviction of Bobby Dean Stacy and remanding the case to the Cabell County Circuit Court for a new trial.

After reading the majority opinion, I understand how the public might believe that there is no equal justice under the law. In *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219 (1987), Stacy's co-defendant in the murder of Officer Harmon was tried and found guilty. His conviction was affirmed by this Court despite the same defect the majority clings to in this opinion. Yet the majority justifies the *Mayle* affirmance by claiming that the trial court "at least instructed the jury that the State had the constitutional duty of proving felony-murder beyond a reasonable doubt." At footnote 4 of its opinion, the majority cites in full the *Stacy* Court's Instructions Nos. 2 and 6, which

clearly instruct the jury about the State's burden of proving the crime beyond a reasonable doubt. How does this differ from *Mayle?*

In order to reverse the *Stacy* conviction, the majority adopted the plain error doctrine contained in Rules 30 and 52(b) of the West Virginia Rules of Criminal Procedure. The majority admits that we rarely recognize plain error, even of constitutional magnitude, unless it substantially affects the defendant's rights. I am hard pressed, in fact unable, to find the error which the majority claims substantially affected Stacy's rights and impaired the truth-finding process to the extent it resulted in a miscarriage of justice. Moreover, the majority does not claim the "substantial error" rises to a constitutional level.

The majority finds reversible error in the trial court's failure to instruct on the elements of the criminal offense of robbery, an underlying element of felony-murder in this case. This error was not objected to by the defendant during trial, but was raised for the first time on appeal. The defendant's highly qualified Ohio attorney never once argued that the State had failed to prove felony-murder. The jury, brought in from Grant County to satisfy a change of venue motion, heard evidence for six days and within one hour found a verdict of guilty of first degree murder without a recommendation of mercy. This Court has never held that the failure to instruct the jury as to the underlying felony in a felony-murder case constitutes reversible error. Regardless of the case law in other states, I can see no reason to do so in this case.

We are asked to believe that the *substantial* rights of the defendant were impaired because a jury instruction setting out the elements of robbery were not read to the jury. In syllabus point 2 of *State v. Hatala*, 176 W.Va. 435, 345 S.E.2d 310 (1986), this Court recognized the existence of the plain error doctrine, but cautioned that it "is to be used *sparingly* and only in those circumstances in which a miscarriage of justice would otherwise result." (Em-

phasis added.)[1]  In light of the substantial evidence presented at trial, I believe the majority's opinion results in a miscarriage of justice to the citizens of this State. Quite simply, I do not believe that the failure to instruct the jury on the underlying felony substantially impaired the truthfinding process of the jury so as to result in a miscarriage of justice to Bobby Dean Stacy.[2]

---

**1.**  *See United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 12 (1985), in which the United States Supreme Court stated that the plain error doctrine is to be " 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'  *United States v. Frady,* supra [456 U.S. 152], at 163, n. 14, 71 L.Ed.2d 816, 102 S.Ct. 1584 [1592]. [ (1982) ]."

**2.**  This case was not reversed on the question of Mr. Norman's identification.  The discussion of that question was pointed out in the majority opinion for the benefit of the court when and if the case is retried.