357 S.E.2d 219

**STATE of West Virginia**

v.

**Wilbert MAYLE**

**No. 17241.**

Supreme Court of Appeals of West Virginia.

April 1, 1987.

Rehearing. Denied June 3, 1987.

**28**

Jerry Weiner, Columbus, Ohio, for appellant.

Charlie Brown, Atty. Gen., Mary Beth Kershner, Asst. Atty. Gen., Charleston, W.Va., for appellee.

BROTHERTON, Justice:

This is an appeal from a judgment of felony murder by the Circuit Court of Cabell County in December, 1982. The jury trial was held in Fayette County, West Virginia, due to a change of venue motion, before Judge Alfred E. Ferguson. We find no error in the proceedings and affirm.

On December 14, 1981, at 1:15 a.m. two men entered a McDonald's restaurant in Chesapeake, Ohio. One was a tall, white man, the other was a shorter, black man. They wore dark blue or black ski masks over their faces. The pair demanded that the employees give them the combination to the safe. The employees did not know the combination, so the robbers took the keys to one of the employee's cars, a 1972 Matador, and left in the stolen car. The car was later found in Huntington, West Virginia, with a tape deck and some tapes missing.

Approximately one-half hour after the Ohio robbery, Officer Byard of the Huntington Police Department observed a possible breaking and entering by two men at a gasoline station. He notified Officer Harman, a few blocks away. Harman indicated over the radio "I've got 'em over here." A few minutes later, Officer Byard heard a gunshot and started running to Harman's aid. He heard more gunshots, and saw two men running west down Jefferson Street in Huntington. Officer Harman had been fatally wounded by several hard blows to the head and five gunshot wounds from his service revolver. Officer Byard observed the men getting into a green Buick and leaving the scene.

One witness, Ted Norman, looked out the window of his home and saw Officer Harman on the ground with a man on top of him trying to take something from the officer. The man raised up and shot Harman several times. Mr. Norman turned on his porch light and clearly saw the man's face at a distance of between eight and ten feet. He later identified the man as Bobby Stacy. Other witnesses saw two men run-

ning from the area, one white and the other a shorter, fair-skinned black man.

A short time after the shooting, Officer Leroy Campbell of the Kenova Police Department passed a car driven by a black man travelling west. Officer Campbell turned around and followed the vehicle and then passed it. As he passed it, the driver turned his head toward Campbell. The driver was later identified by Campbell as Wilbert Mayle. At this time the officer learned of the shooting of Officer Harman over his radio. When he received a description of the vehicle and the suspects, he realized that it was the car he had just passed. The officer blocked the Kenova-Catlettsburg bridge on Route 60 leading into Kentucky. The car's occupants obviously saw the roadblock and turned left off Route 60 onto 23rd Street in Kenova. Officer Campbell followed, and found the vehicle abandoned on Sycamore Street, which is a dead-end street by the river.

Kathy Pearson, a resident of Columbus, Ohio, had been a friend of Bobby Stacy for several years and was acquainted with Wilbert Mayle. Pearson was told by Stacy at 6:00 p.m. on the night of the shooting that "he had to go meet Jackie and pick him up and go to the hills and take care of business." Jackie was Wilbert Mayle's nickname. It is undisputed that Stacy and Mayle were good friends and had been for a long time.

The automobile found on Sycamore Street was registered in the name of Bobby Stacy and contained a tape deck and tapes stolen from the Matador in Ohio, a black ski mask, and Officer Harman's gun. Wilbert Mayle's fingerprints were found on the steering wheel. An analysis of hair samples found in two ski masks (the one found in the car and another found near the car) revealed that one mask had hair consistent with Mayle's hair and the other had hair consistent with Bobby Stacy's and Mayle's.

At trial, Mayle's defense witnesses were thoroughly discredited. In particular, Mayle's wife and his brother-in-law both testified that Mayle's hair was short, and he was clean shaven at the time of the robbery. This testimony would have served to rebut the testimony of Officer Campbell, who had testified that the man he identified as Wilbert Mayle had a beard or goatee, a mustache, and "bushy" hair. However, the prosecution introduced a picture taken of Mayle on the day after the murder, cashing a check at Huntington National Bank in Columbus. The picture shows that he had "bushy" hair, a mustache, and a goatee.

At the end of the evidence, the jury found Wilbert Mayle guilty of first degree murder, with a recommendation of mercy. He appeals to this Court, citing numerous errors which we now address.

## I.

Several points of error which were raised do not require lengthy discussion.

Mayle argues that a photograph showing the scene where the officer was killed was gruesome and prejudicial. The photograph did not contain any showing of the officer's body, but merely the spot where he had been found and some of his blood. Blood alone does not make a photograph gruesome. *See State v. Buck,* 170 W.Va. 428, 294 S.E.2d 281, 285 (1982). The photograph was properly admitted.

Another assignment of error is that the defense was limited in its cross-examination of Officer Byard. Byard had allegedly made some statements which were inconsistent with the testimony at Bobby Stacy's trial. The parties approached the bench and the prosecution insisted that a proper foundation should be laid for the impeachment, *i.e.,* showing Byard the statement and allowing him to admit or deny that he made it. This was a problem because the transcript had not yet been typed, so there was no written statement. The judge, therefore, had the trial continue, but in the meantime ordered the court reporter to transcribe the relevant portions of Stacy's trial so that an impeachment could be accomplished. Byard was later recalled as a witness by the defense and was asked about the "inconsistent" testimony. He was allowed to do so with lead-

ing questions in a fashion similar to cross-examination. The trial court did not limit the examination. There was no error.

■ Mr. Mayle claims that his due process rights were violated because more than two years elapsed before his transcript was supplied to him so that he could complete this appeal. Nevertheless, we have allowed him his appeal, and he has shown no prejudice by the delay of two years. "A criminal case will not be reversed unless the record shows error committed, prejudicial to the prisoner." Syl. pt. 1, *State v. Lane*, 44 W.Va. 730, 29 S.E. 1020 (1898).

## II.

■ Mayle objects to what he claims is an improper *voir dire*. The *voir dire* in this case consisted of the twenty prospective jurors being questioned at the same time. The appellant objected to this procedure as prejudicial and asked for permission to *voir dire* each juror individually. To require this in every case would create a significant burden on the courts and greatly add to the length of criminal trials. "In a criminal case, the inquiry made of a jury on its *voir dire* is within the sound discretion of the trial court and not subject to review, except when the discretion is clearly abused." Syl. pt. 2, *State v. Beacraft*, 126 W.Va. 895, 30 S.E.2d 541 (1944). An individual *voir dire* is only required when a juror has disclosed a possible area of prejudice. *State v. Schrader*, 172 W.Va. 1, 302 S.E.2d 70, 72 (1982). No juror disclosed any possible prejudice on the record in this case. There was no abuse of the trial court's discretion in refusing individual *voir dire*.[1]

## III.

Murder trials are often exciting for the jury. This one had more than the usual share of thrills. While the jury was visiting the scene of the murder, a van jumped the curb and apparently deliberately tried to run down several members of the jury.

The van did not hit any jurors, but narrowly missed some. Because of this incident, the defense requested a mistrial. The judge later instructed the jury that the van incident had nothing to do with the trial and polled the jury as to whether they could fairly continue. Although at least one juror was reluctant at first, all later agreed that they could fairly continue on the case.

■ If we were to grant the appellant's request for a mistrial merely because the jury was threatened, it would open the season on juries. An unscrupulous defendant could arrange for a friend to shoot over the jury's head, or drive a car at them, or something similar, and a mistrial would result. Because of this, a court should not declare a mistrial because a juror was threatened, unless it is apparent that the juror's impartiality has been so affected that he can no longer fairly decide the facts.

■ In *State v. Dye*, 171 W.Va. 361, 298 S.E.2d 898 (1982), a juror received a threatening phone call made on behalf of the defendant during the course of the trial. The call threatened the juror's brother, who was then a prisoner at the West Virginia State Penitentiary. The juror initially told the court that this would prevent her from maintaining impartiality, but later decided that she could render a fair and impartial verdict. In that case we held that the trial court had not abused its discretion in allowing the threatened juror to continue. We find the present case similar to *Dye* and agree with the trial court's decision to continue the trial.

## IV.

■ Kathy Pearson, the girlfriend of Bobby Stacy, testified as a prosecution witness. On the night of the murder, she was told by Stacy that he "had to go to meet Jackie and pick him up and go to the hills and take care of business." "Jackie" was Wilbert Mayle's nickname. She understood this statement to meant that they were

---

**1.** For further discussion of when individual *voir dire* is required, *see State v. Lassiter*, 177 W.Va. 499, 354 S.E.2d 595, 599–600 (1987). *See also*

going out to commit robberies, a fact to which she testified because she didn't really object to robberies, but she did object to murder. The appellant claims that this statement was hearsay, not covered by an exception.

■ We disagree. The statement of a co-conspirator in the furtherance of the conspiracy is recognized as a hearsay exception. See, e.g., syl. pt. 6, *Conway v. Bailey*, 91 W.Va. 324, 112 S.E. 579 (1922).[2] The statement by Bobby Stacy to his girlfriend was to explain his absence and to keep her from making an effort to locate him. As such, it was a furtherance of the criminal conspiracy. The statement, therefore, was properly admitted.

### V.

■ Mr. Mayle objects to the prosecution putting in evidence of prior convictions over ten years old. Defense counsel questioned Kathy Pearson concerning Mayle's nonviolent nature and asked her if he was "a pretty nice guy." She answered in the affirmative. The prosecution rebutted this statement with evidence of two prior crimes, one in 1968 for auto theft, and one in 1970 for attacking a police officer. The defense objected to the questioning. The appellant argues for the first time on appeal that the prior convictions were inadmissible because of Federal Rule 609(b), which sets a specific time limitation, allowing only evidence of convictions less than ten years old. Federal Rule 609(b) was not adopted as a part of the West Virginia Rules of Evidence until December 18, 1984, to be effective February 1, 1985. Mayle's trial was in December, 1982, over two years earlier. Rule 609(b) is one of the "witness" rules and is not applicable as argued by the appellant. Under the law before enactment of the Rules of Evidence, there was no time restriction as to the use of a prior felony conviction. The remote-

ness in time was merely a factor which went to the weight of the testimony. *See* F. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, 187 (1986). The objection is without merit.[3]

### VI.

■ Finally, Mr. Mayle claims that the State failed to meet its burden in proving felony murder under W.Va.Code § 61–2–1 (1984), which provides: "Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, rape, robbery or burglary, is murder of the first degree." The State is not required in a felony murder case to prove any specific intent to kill, premeditation, or malice. *See* syl. pt. 7, *State v. Sims*, 162 W.Va. 212, 248 S.E.2d 834 (1978). Instead, "the elements which the State is required to prove to obtain a conviction of felony murder are: (1) The commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt." *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251, 267 (1983).

■ We will look at each of the three elements individually, starting with the commission or attempt to commit a felony. A felony was unquestionably committed in this case. A robbery, which is one of the enumerated felonies in § 61–2–1, was committed when the two men took car keys at gunpoint from an employee of a McDonald's restaurant in Chesapeake, Ohio.

The defendant's participation in such commission or attempt was also satisfactorily proved. In this case, one of the robbers was a short, black man who fit

---

*State v. Finley*, 177 W.Va. 554, 355 S.E.2d 47, 50 (1987).

**2.** "The co-conspirators' exception was first approved by the United States Supreme Court in *United States v. Gooding*, 12 Wheat. (25 U.S.) 460, 6 L.Ed. 693 (1827), and its English roots can be traced to the time of the French Revolu-

tion." *State v. Lassiter*, 177 W.Va. 499, 354 S.E.2d 595, 601 (1987).

**3.** We restrict our ruling on this issue to the holding that Rule 609(b) does not apply. Any other errors which may or may not have been committed by the introduction of this evidence were not raised on motion for a new trial or as error on appeal, and we do not address them.

Mayle's general description. He was wearing a ski mask. A ski mask similar to the one used in the robbery was found in Bobby Stacy's car, and another was found near the car. Both had hair similar to Mayle's hair in them. The car, which Mayle was seen driving shortly after the robbery, was quickly abandoned when a police officer came to investigate,[4] and contained articles stolen from a car which was taken during the McDonald's robbery. While individually each item of evidence presented above would be quite weak evidence, taken together it is strong evidence pointing toward Mayle's guilt from which a jury could easily conclude that there was no reasonable hypothesis of innocence.

Finally, there was sufficient evidence to support the jury's determination that Officer Harman was killed during the commission of the felony. The act of robbing had been completed several minutes earlier, but the incident was not complete. The robbers had yet to return home to a place of safety. The distance from the McDonald's in Chesapeake to the scene of the shooting was only 2.1 miles. The loot had not been distributed, but remained in the trunk of Stacy's car. Whether the robbers were conducting their escape or were moving on to another crime, their activities were a part of "one continuous transaction."[5]

In *State v. Wayne*, 169 W.Va. 785, 289 S.E.2d 480 (1982), the defendant was convicted of first degree murder in a felony murder situation. His claim of error to this Court was that the underlying felony

of the robbery had been completed prior to the murder. After an examination of the law of several other jurisdictions, we concluded that the felony murder statute does apply where the robbery was complete but the defendants were still in the act of escape. We noted with approval the case of *State v. Squire*, 292 N.C. 494, 234 S.E.2d 563 (1977), where a car containing bank robbers was stopped by a state policeman for a traffic violation ten miles from the scene of the robbery. As the state policeman approached the car, he was killed. Despite the distance from the scene, the North Carolina court found that the robbers were still in the act of escape and applied the felony murder rule. In the present case, the escape was not complete. Wilbert Mayle and Bobby Stacy were still "in the hills taking care of business." They were still involved in the chain of events surrounding the robbery. Therefore the felony murder rule was properly applied.[6]

For the above reasons, the judgment of the Circuit Court of Cabell County is affirmed.[7]

Affirmed.

---

4. Mayle not only abandoned the car, but when police officers came to his house to arrest him, he attempted to flee out the back door.

5. *See State v. Wayne*, 169 W.Va. 785, 289 S.E.2d 480, 482 (1982).

6. The defense relies heavily on the fact that much of this evidence is circumstantial. Circumstantial evidence is not *per se* less reliable than direct evidence. It is merely a different class of evidence which has its special dangers and its special advantages. *See generally* 1A *Wigmore on Evidence* § 26 (Tillers rev. 1983). In many cases circumstantial evidence can be stronger than direct evidence. A fingerprint found on a shelf would probably be stronger evidence that the owner of the fingerprint put his finger on the shelf than a witness swearing that it had not happened. Further, a dog track

in the mud would be far more likely to convince the average man that a dog had come by than a host of witnesses swearing that no dog had passed. In this case, the defense put on direct testimony that Mr. Mayle was clean shaven on the night of the murder, and the prosecution's introduction of a photograph showing him a few hours later with a mustache and goatee was merely circumstantial evidence that Mr. Mayle was not clean shaven at the time of the murder. Nevertheless, it was very powerful evidence, and the jury apparently believed it over the testimony of two witnesses to the contrary.

7. Other assignments of error raised by the appellant we find to be without merit and dismiss summarily.