IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

**FILED**

**March 13, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 14-0086

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent

v.

JASON W. HOLSTEIN,
Defendant Below, Petitioner

Appeal from the Circuit Court of Kanawha County
Honorable Jennifer F. Bailey, Judge
Criminal Action No. 09-F-389

AFFIRMED

Submitted: February 11, 2015
Filed: March 13, 2015

Sam Marsh, Esq.
Marsh Law Office
Charleston, West Virginia
Counsel for the Petitioner

Patrick Morrisey, Esq.
Attorney General
Shannon Frederick Kiser, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for the Respondent

JUSTICE LOUGHRY delivered the opinion of the Court.

**SYLLABUS BY THE COURT**

1. "A direct appeal from a criminal conviction based on a guilty plea will lie where an issue is raised as to the voluntariness of the guilty plea or the legality of the sentence." Syl. Pt. 1, *State v. Sims*, 162 W.Va. 212, 248 S.E.2d 834 (1978).

2. "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995).

3. "The Supreme Court of Appeals reviews sentencing orders . . . under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands." Syl. Pt. 1, in part, *State v. Lucas*, 201 W.Va. 271, 496 S.E.2d 221 (1997).

4. "Sentences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review." Syl. Pt. 4, *State v. Goodnight*, 169 W.Va. 366, 287 S.E.2d 504 (1982).

5. "A guilty plea based on competent advice of counsel represents a serious admission of factual guilt, and where an adequate record is made to show it was voluntarily and intelligently entered, it will not be set aside." Syl. Pt. 3, *State ex rel. Burton v. Whyte*,

163 W.Va. 276, 256 S.E.2d 424 (1979).

6. "When a criminal defendant proposes to enter a plea of guilty, the trial judge should interrogate such defendant on the record with regard to his intelligent understanding of the following rights, some of which he will waive by pleading guilty: 1) the right to retain counsel of his choice, and if indigent, the right to court appointed counsel; 2) the right to consult with counsel and have counsel prepare the defense; 3) the right to a public trial by an impartial jury of twelve persons; 4) the right to have the State prove its case beyond a reasonable doubt and the right of the defendant to stand mute during the proceedings; 5) the right to confront and cross-examine his accusers; 6) the right to present witnesses in his own defense and to testify himself in his own defense; 7) the right to appeal the conviction for any errors of law; 8) the right to move to suppress illegally obtained evidence and illegally obtained confessions; and, 9) the right to challenge in the trial court and on appeal all pre-trial proceedings." Syl. Pt. 3, *Call v. McKenzie*, 159 W.Va. 191, 220 S.E.2d 665 (1975).

7. "Where there is a plea bargain by which the defendant pleads guilty in consideration for some benefit conferred by the State, the trial court should spread the terms of the bargain upon the record and interrogate the defendant concerning whether he understands the rights he is waiving by pleading guilty and whether there is any pressure

ii

upon him to plead guilty other than the consideration admitted on the record." Syl. Pt. 4, *Call v. McKenzie*, 159 W.Va. 191, 220 S.E.2d 665 (1975).

8. "A trial court should spread upon the record the defendant's education, whether he consulted with friends or relatives about his plea, any history of mental illness or drug use, the extent he consulted with counsel, and all other relevant matters which will demonstrate to an appellate court or a trial court proceeding in *habeas corpus* that the defendant's plea was knowingly and intelligently made with due regard to the intelligent waiver of known rights." Syl. Pt. 5, *Call v. McKenzie*, 159 W.Va. 191, 220 S.E.2d 665 (1975).

9. "'Disparate sentences for codefendants are not per se unconstitutional. Courts consider many factors such as each codefendant's respective involvement in the criminal transaction (including who was the prime mover), prior records, rehabilitative potential (including post-arrest conduct, age and maturity), and lack of remorse. If codefendants are similarly situated, some courts will reverse on disparity of sentence alone.' Syl. Pt. 2, *State v. Buck*, 173 W.Va. 243, 314 S.E.2d 406 (1984)." Syl. Pt. 3, *State v. Robey*, 233 W.Va. 1, 754 S.E.2d 577 (2014).

LOUGHRY, Justice:

This case is before this Court upon the appeal of the petitioner, Jason W. Holstein, from the December 12, 2013, order of the Circuit Court of Kanawha County re-sentencing him to life imprisonment without the possibility of parole.[1]  The petitioner contends that his guilty plea to first degree murder (felony murder) was not entered knowingly, voluntarily, and intelligently, and that his sentence is disproportionate to the sentences imposed upon his co-defendants.  Following a careful review of the briefs, the arguments of counsel, the record submitted, and the applicable law, this Court finds no reversible error and affirms both the petitioner's conviction and sentence.

## I.  Facts and Procedural Background

On January 19, 2009, the petitioner and co-defendants Larry Cantrell and Joshua Taylor traveled to the home of David Scarbro in Chelyan, West Virginia, with the intent to rob him of drugs and money.  The trio was armed with a handgun and a sawed-off shotgun, ostensibly to frighten the victim.  The petitioner and Mr. Cantrell obtained these weapons from a third-party after which they modified the shotgun in preparation for the instant crimes.

---

[1]The petitioner was resentenced for purposes of filing a timely petition for appeal.

1

During the course of the robbery, Mr. Scarbro was repeatedly struck with the guns, causing him to suffer gaping wounds to his head, face, and other areas of his body, and he was repeatedly kicked in the ribs. The victim's wife returned home as the robbery was proceeding. Mrs. Scarbro reported that as she neared the residence, she heard her husband arguing with a man. After she began beating on the front door, it opened, and she was pulled inside the home and thrown into a chair. Two masked men and her husband then ran onto the porch at which time she heard two gun shots. Mrs. Scarbro found her husband lying motionless on the porch. He had been shot once in the back at close range, and he died at the scene from his injuries. Mrs. Scarbro did not know who shot her husband.

Following an investigation by the Kanawha County Sheriff's Department, all three men were arrested. Co-defendant Cantrell told investigating officers that co-defendant Taylor owed him $200. To facilitate repayment, Cantrell introduced Taylor to the petitioner for the purpose of the petitioner helping Taylor to commit robberies. During his arrest interview, Cantrell stated that he participated in the robbery because the petitioner had told him if something went wrong, he would have to shoot Taylor to eliminate any witnesses.[2] According to Cantrell, the petitioner would not stop saying "he finally got one, talking about killing someone." When questioned by authorities, co-defendant Taylor confirmed that

---

[2]Cantrell apparently felt responsible for Taylor's well-being having introduced him to the petitioner.

2

Cantrell introduced him to the petitioner for the purpose of the petitioner showing him things about robbing people.[3] Regarding the murder of Mr. Scarbro, Taylor stated that as he ran out of the victim's home, he saw the petitioner shoot Mr. Scarbro as he lay face down on the porch.

Consistent with the statements given by Cantrell and Taylor, the petitioner told investigating officers that Cantrell asked him to speak with Taylor about robberies, which he did, including advising Taylor to be armed with a weapon in case his intended victims had weapons. Regarding the instant crime, however, the petitioner denied shooting Mr. Scarbro, reporting instead that co-defendant Taylor said the gun "just went off."

All three men were indicted on two counts of breaking and entering,[4] one count of attempted armed robbery,[5] and one count of first degree murder (felony murder) in violation of West Virginia Code § 61-2-1 (2014).[6] Cantrell and Taylor each pled guilty to

---

[3]The appendix record contains co-defendant Taylor's statement to authorities that the petitioner was brought into the robbery because Cantrell wanted "somebody that knew exactly what the f--k they were doing." Describing the petitioner as seeming "professional," Taylor added the petitioner told him "exactly what the f--k I was supposed to do."

[4]W.Va. Code § 61-3-11 (2014).

[5]W.Va. Code § 61-2-12(a) (2014).

[6]West Virginia Code § 61-2-1 provides, in pertinent part, as follows:

(continued...)

3

first degree felony murder and both were sentenced to life imprisonment with the possibility of parole.[7]

On April 12, 2010, the petitioner entered into a written plea agreement with the State in which he agreed to plead guilty to the first degree felony murder and, in return, the State agreed to dismiss the other counts in the indictment and to stand silent at sentencing. Later this same day, a plea hearing was held before the circuit court. During this hearing, the

---

[6](...continued)

> Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four, chapter sixty-a of this code, is murder of the first degree.

We previously explained the elements of felony murder in syllabus point five of *State v. Mayle*, 178 W.Va. 26, 357 S.E.2d 219 (1987):

> "The elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies [set forth in West Virginia Code § 61-2-1]; (2) the defendant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt." *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251, 267 (1983).

[7]Cantrell also pled guilty to attempted robbery and was sentenced to twenty years imprisonment to run concurrently with his life with mercy sentence. Cantrell and Taylor were sentenced prior to the petitioner's sentencing.

4

petitioner testified he had read, reviewed, and discussed the plea agreement with his counsel, Tom Price, before signing the agreement. Mr. Price confirmed this joint review and expressed his belief that the plea was in the petitioner's best interest. The circuit judge asked the petitioner whether he understood the crimes he was charged with committing. He responded affirmatively. When questioned about his education, the petitioner stated he had a high school diploma and had been attending barber college.

The circuit court also explored the petitioner's mental health during the plea hearing, asking him whether he had ever been treated or hospitalized for mental health issues. The petitioner responded, "No, ma'am. Never[,]" adding that he had undergone six weeks of outpatient therapy for drug addiction in 2008. When asked whether he was under the influence of drugs or alcohol at the time of the hearing, the petitioner testified, "No, ma'am. I'm not." Regarding his prescription drug use, the petitioner testified he had been prescribed Catapres for blood pressure; Neurontin for a burning and tingling sensation in his feet; Elavil[8] to help him sleep; and Remeron as an antidepressant and sleep aid. He indicated the Elavil and Remeron had been prescribed by a psychiatrist since his instant incarceration, explaining he takes those particular drugs once daily at night. The petitioner also alleged that he was previously diagnosed with bipolar disorder.

---

[8]Elavil is an antidepressant.

5

In assessing the petitioner's mental status, the circuit judge observed that the petitioner had met with his counsel, Mr. Price, for approximately three hours that morning and asked whether counsel found the petitioner to be "lucid" and whether he understood the purpose of the plea hearing. In response, Mr. Price described the petitioner as "lucid and knows where he is and why we're here and what he's doing." Mr. Price also responded affirmatively when asked whether the petitioner had always been "oriented as to time and place" and able "to recall past events." Recounting his contact and collaboration with the petitioner, Mr. Price stated he had reviewed the State's evidence with the petitioner and had discussed all counts in the indictment with him and the defense to be presented based on the evidence. In response to the circuit court's inquiry, the petitioner advised he was completely satisfied with the representation provided by Mr. Price, whom he described as having been very thorough in explaining the elements of the crime of first degree murder and what the State would have to prove before he could be convicted of that crime by a jury. The circuit judge then questioned the petitioner, as follows:

> Q. Now could you tell me what today's date is?
> A. April 12th of the year 2010.
>
> Q. And you understand why you're here today?
> A. Yes, ma'am. I do.
>
> Q. What would that be?
> A. I'm here today, was prepared this morning to go to trial for several offenses. And since being here . . . I have entered a plea of guilty for my behalf involving my part in my crimes.

6

. . . .

Q.  Mr. Holstein, this plea agreement is dated today. . . . Have you had an opportunity to discuss this agreement, this decision of yours, with family members or other person whose advice you respect?

A.  Yes, ma'am. I had my attorney, Mr. Price, consult with my family on my behalf . . . .

Q.  Has anyone promised you a lenient sentence or made any promise to you other than as set forth in the . . . plea agreement?

A.  No, ma'am.

Q.  Has anyone threatened, intimidated, coerced or pressured you in any manner to give up your constitutional rights to a trial?

A.  No, ma'am, they haven't.

Q.  Okay. And are you telling me, Mr. Holstein, that you are here today asking me to accept this agreement in [sic] your plea of your own free will?

A.  Yes, ma'am. I am.

Q.  This is your decision?

A.  Yes, ma'am.

Prior to accepting the petitioner's plea, the circuit court addressed with the petitioner each of the rights he would be relinquishing through his guilty plea, including his presumption of innocence; his right to a trial before an impartial jury of twelve persons; the State's burden of proving his guilt beyond a reasonable doubt before he could be found guilty by a jury; his right against compelled self-incrimination; his right to present witnesses to testify on his behalf; and his right to question the State's witnesses and to confront his

7

accusers.  The petitioner testified that he understood each of the rights he would be relinquishing through his guilty plea, including the limits on traditional appeal rights.[9]

Satisfied the petitioner understood the rights he would be relinquishing and that the decision to enter a guilty plea was of his own free will, the circuit judge explained the potential sentence that could be imposed if she were to accept his guilty plea to first degree felony murder.  The petitioner affirmed his understanding that he could be sentenced to life in prison without the possibility of parole; similarly, Mr. Price confirmed he had explained to the petitioner what life without the possibility of parole meant; that sentencing would be entirely in the court's discretion; and that the State would stand silent as to sentencing pursuant to the terms of the written plea agreement.  The circuit judge then advised the petitioner that if she were to accept his guilty plea and the plea agreement, the Adult Probation Department would prepare a written, pre-sentence investigation report upon which she would "rely heavily . . . in determining . . . a just and proper sentence in this matter."  As the circuit judge explained:

_____

[9]The circuit judge explained to the petitioner that if he were to go to trial and a jury found him guilty beyond a reasonable doubt of one or more crimes, he would have the right to appeal his conviction to this Court, which may or may not set aside his conviction.  She further explained that if she were to accept his guilty plea and order him convicted, he would "not have that traditional right to appeal" that decision.  When the judge asked whether the petitioner understood what she had just explained to him, he responded, "Yes, ma'am. I understand."

Q. You understand no one can guarantee to you what I might do. It is in my discretion as to whether you would spend the rest of your life in a state correctional facility without being eligible for parole, or whether you could be eligible for parole.

• • • •

I will consider what you and your attorney have to say on the date of sentencing . . . the State of West Virginia is not going to take a position other than to cross-examine witnesses which you and your attorney may offer, and also would advise the Court if there are any factual issues that need to be brought to this Court's attention as the [pre-sentence] report might contain.

• • • •

[T]he bottom line is no one can guarantee to you what sentence I might impose. Do you understand that?
A.      Yes, ma'am.

Finally, before allowing the petitioner to enter his guilty plea, the circuit court provided him with another opportunity to confer with his counsel. Thereafter, Mr. Price informed the court that he had conferred with the petitioner, who was ready to proceed at that time. The petitioner then entered his guilty plea to first degree murder, after which the circuit judge asked, "Are you pleading guilty because you're guilty, Mr. Holstein?" The petitioner responded, "Yes." The petitioner then gave the factual basis of his crime:

[O]n the evening somewhere between the hours of 7:30 and 8:00 o'clock p.m., I was involved in a crime that happened on January 19, 2010 at Number 1 Douglas Court in Chelyan, West Virginia in the county of Kanawha.

I had tried to take something that didn't belong to me. And I just, things just didn't go the way everything was supposed to go. It got out of hand. One thing led to another and before I knew it, there was a man deceased and at the end of my crimes.

The prosecutor then added:

[A]ll along this has been a felony murder.[10]

• • • •

[T]his defendant and two other co-defendants who've already plead guilty to first degree murder.

They went in the house with the purpose of robbing David Scarbrough [sic]. They all three participated in the robbery of Mr. Scarbrough [sic], and as a result Mr. Scarbrough [sic] was shot and killed which would make this felony murder of all three co-defendants.

Upon the court's inquiry, Mr. Price advised that both he and the petitioner agreed with the facts as recounted by the prosecutor in support of felony murder.

Thereafter, the circuit court found the petitioner had freely and voluntarily entered his guilty plea with the advice and consultation of competent legal counsel and had understood the consequences of his plea, including the possible penalties the court could impose at sentencing. The circuit court accepted the petitioner's guilty plea, approved the

[10]*Mayle*, 178 W.Va. 26, 28, 357 S.E.2d 219, 221, syl. pt. 5.

10

written plea agreement between the petitioner and the State, and adjudged the petitioner guilty of committing the felony offense of first degree murder.

Subsequent to the petitioner's conviction and prior to his sentencing, the Adult Probation Department prepared a pre-sentence report.[11]  This lengthy report describes the petitioner as "well known to authorities and Officers in the Adult Probation Department, Department of Corrections, Home Confinement, Parole, and Juvenile Probation due to his extensive criminal history[,]" which includes convictions for petit larceny, destruction of property, and eight felony breaking and enterings.  As reflected in the report, the petitioner committed the instant crime within three months of being discharged from parole and had "admitt[ed] to planning the robbery in great detail and advising others [co-defendants Cantrell and Taylor] how to commit such a robbery 'properly.'"  The report also contains statements taken from Cantrell, Taylor, and others, all of whom indicated the petitioner was either observed shooting the victim, admitted to shooting the victim, or bragged about doing so afterwards.[12]

[11]The 121-page pre-sentence report includes the Kanawha County Sheriff's Department's seventy-seven page Report of Investigation.

[12]The pre-sentence report recounts co-defendant Cantrell's statement that the petitioner would not stop saying "he finally got one, talking about killing someone."  A similar statement was made to investigative officers by Jon Kazee.  He reported that the three men traveled to his home after the subject crimes at which time the petitioner admitted that he shot David Scarbro and bragged about having done so.  Co-defendant Taylor told authorities the petitioner shot the victim even though the victim was "laying . . . on the porch
(continued...)

11

With regard to the question of whether the petitioner was remorseful for the instant crime, the pre-sentence report states:

> Records show [the petitioner] has a history of failing to tell the truth and trying to manipulate others . . . to extricate himself from problematic situations . . . while, at the same time, appearing as though he is seemingly compliant, worthy and capable of rehabilitation or change, and sincerely sorry for his actions and wrongdoings. As this Officer has repeatedly dealt with [the petitioner] for years and is quite familiar with him, this Officer cannot stress enough a belief that [the petitioner] . . . is masterful at appearing remorseful, genuine, and sincere, though all, in this Officer's opinion, is a performance or ruse.[13]

(Footnote added.). The probation officer concluded the report by stating:

---

[12](...continued)
there and . . . he wasn't getting up. . . . He [the petitioner] just ran by [and] 'pop' . . . . He [the petitioner] wanted to kill him [the victim] in the house too, but his [the victim's] old lady saved his life." Taylor also reported that the petitioner stated, "Well this is the sixth person I've shot. I hope this one dies."

[13]According to the pre-sentence report:

> [The petitioner] repeatedly has used his family, the lack of a father, the death of his grandfather, and his grandmother's age as an excuse for his actions. . . . [T]hose apologies remain nearly the same to this day. . . .
>
> • • • •
>
> In his more recent letter to the victim's family . . . he wrote of what he called his "bad friends syndrome". . . . It is this Officer's opinion that [the petitioner's] letter is yet another example of his thinking that because he is personable . . . he can manipulate others, including the Court . . . [as] can only be seen after repeated involvement, observation, and analysis, and finally synthesis of all information, writings, and actions by [the petitioner] over the course of years.

> [The petitioner] . . . expressed no sincere remorse for his actions or towards the victim, accepts little to no responsibility, and provided, yet again, a statement that seems to indirectly portray himself as a victim of sorts or as someone who is inexperienced or a follower . . . It is this Officer's opinion [] [that the petitioner] is simply good at playing the game.

A sentencing hearing was held before the circuit court on June 30, 2010. During this hearing, the petitioner's counsel confirmed he had reviewed the pre-sentence report with the petitioner. When the court asked whether there were any factual matters contained in the pre-sentence report that the petitioner wished to raise, his counsel responded, "No. There is nothing that is factually inaccurate in the report . . . ."

The petitioner presented the testimony of four witnesses offered in mitigation of sentence: his youngest brother, his best friend, his mother, and his stepfather. The petitioner also testified, stating during his allocution, "I don't expect to get mercy today." He apologized to the court, the victim's family, and to his family and asked for their forgiveness. Upon its consideration of the witnesses' testimony and the petitioner's allocution, the circuit judge stated:

> [A]s I read through this very lengthy, well put together [pre-sentence] report, it's sad. . . . Because your entire life[14] has been one of crime and locked up, let out, given opportunities.

_____

[14]The petitioner was twenty-nine years old at the time of his sentencing.

13

. . . .

And I believe, based on everything I have read, that these acts committed by you were deliberate. They were malicious. They were violent and totally brutal.

I have not only read the accounts of everyone of [sic] this very thorough investigation conducted by the Kanawha County Sheriff's Department, but I have read, and seen now, photographs of the victim which are incredible and will be in my mind probably the rest of my life.

Because I see a victim who was already down and very injured . . . and then we know was shot. Frankly, for no reason.

This whole incident was a deliberate incident, frankly, from where I sit. A very well planned and thought out act which involved making maps, a discussion about who was going to do what, and when and what you hoped to achieve, and very deliberate acts by you in obtaining guns. All the way to having a shotgun sawed off for this very act that was committed.

So I frankly believe that your conduct, based on everything I've read, all the way to the point that several people indicate that you said words to the effect, "I finally got one."[15]

These people who made these comments were separated from one another. There's a very consistent thread here about people who said that you bragged about this act.

(Footnotes added.).

The circuit court sentenced the petitioner to life imprisonment without the possibility of parole. The petitioner's motions seeking a reduction of his sentence were

---

[15]*See supra* note 12.

denied by the circuit court. It is from his conviction and sentence that the petitioner seeks relief.

## II. Standard of Review

This case is before this Court upon an appeal from the petitioner's conviction following his guilty plea and the circuit court's sentencing order. As we have previously explained, "[a] direct appeal from a criminal conviction based on a guilty plea will lie where an issue is raised as to the voluntariness of the guilty plea or the legality of the sentence." Syl. Pt. 1, *State v. Sims*, 162 W.Va. 212, 248 S.E.2d 834 (1978). In this regard, "[w]here the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. Pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). Thus, our review is plenary to the extent the petitioner's assignments of error arise out of procedural and constitutional grounds. Regarding the alleged sentencing error, "[t]he Supreme Court of Appeals reviews sentencing orders . . . under a deferential abuse of discretion standard, unless the order violates statutory or constitutional commands." Syl. Pt. 1, in part, *State v. Lucas*, 201 W.Va. 271, 496 S.E.2d 221 (1997). Indeed, "[s]entences imposed by the trial court, if within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review." Syl. Pt. 4, *State v. Goodnight*, 169 W.Va. 366, 287 S.E.2d 504 (1982).

15

## III.  Discussion

## A.  The Petitioner's Guilty Plea

The petitioner argues his guilty plea was not made knowingly, voluntarily, and intelligently.  He contends the circuit court failed to sufficiently determine during the plea hearing whether his alleged bipolar disorder affected his ability to make decisions, to comprehend and appreciate the rights he was surrendering, and to appreciate that someone was going to be held accountable for shooting the victim.[16]  By way of example, the petitioner suggests the circuit court should have asked him whether he was taking his medications, as prescribed, and whether he was currently symptomatic.  In response, the State asserts that the circuit court thoroughly questioned the petitioner in accordance with the requirements of *Call v. McKenzie*, 159 W.Va. 191, 220 S.E.2d 665 (1975).[17]  In support of its argument that the petitioner entered his plea knowingly, voluntarily, and intelligently, the State highlights his affirmative representations during the plea hearing that he was not under the influence of any drugs or alcohol; that he takes his sleeping aid and antidepressant medications once daily at night; and that he was both competent and knowledgeable of the constitutional rights he would be waiving by entering his guilty plea.

---

[16]Although the petitioner also alleges that he has been diagnosed with post-traumatic stress disorder and that he attempted suicide on prior occasions, he did not make these allegations during his plea hearing.

[17]*Call v. McKenzie* is more thoroughly discussed, *infra*.

16

We begin our analysis by recognizing that "[a] guilty plea based on competent advice of counsel represents a serious admission of factual guilt, and where an adequate record is made to show it was voluntarily and intelligently entered, it will not be set aside." Syl. Pt. 3, *State ex rel. Burton v. Whyte*, 163 W.Va. 276, 256 S.E.2d 424 (1979). Decades ago, we outlined the procedures to be followed by trial courts for purposes of insuring that guilty pleas are entered voluntarily and intelligently, as follows:

> When a criminal defendant proposes to enter a plea of guilty, the trial judge should interrogate such defendant on the record with regard to his intelligent understanding of the following rights, some of which he will waive by pleading guilty: 1) the right to retain counsel of his choice, and if indigent, the right to court appointed counsel; 2) the right to consult with counsel and have counsel prepare the defense; 3) the right to a public trial by an impartial jury of twelve persons; 4) the right to have the State prove its case beyond a reasonable doubt and the right of the defendant to stand mute during the proceedings; 5) the right to confront and cross-examine his accusers; 6) the right to present witnesses in his own defense and to testify himself in his own defense; 7) the right to appeal the conviction for any errors of law; 8) the right to move to suppress illegally obtained evidence and illegally obtained confessions; and, 9) the right to challenge in the trial court and on appeal all pre-trial proceedings.

> Where there is a plea bargain by which the defendant pleads guilty in consideration for some benefit conferred by the State, the trial court should spread the terms of the bargain upon the record and interrogate the defendant concerning whether he understands the rights he is waiving by pleading guilty and whether there is any pressure upon him to plead guilty other than the consideration admitted on the record.

> A trial court should spread upon the record the defendant's education, whether he consulted with friends or

17

relatives about his plea, any history of mental illness or drug use, the extent he consulted with counsel, and all other relevant matters which will demonstrate to an appellate court or a trial court proceeding in *habeas corpus* that the defendant's plea was knowingly and intelligently made with due regard to the intelligent waiver of known rights.

Syl. Pts. 3, 4 and 5, *Call v. McKenzie*, 159 W.Va. 191, 220 S.E.2d 665.  These requirements

are echoed in Rule 11 of the West Virginia Rules of Criminal Procedure  ("Rule 11").[18]

---

[18]Rule 11, originally adopted by this Court in 1981, provides, in relevant part, as follows:

> (c) *Advice to Defendant*. — Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, the following:
>
> (1) The nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law; and
> • • • •
> (3) That the defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that the defendant has the right to be tried by a jury and at that trial the right to the assistance of counsel, the right to confront and cross-examine adverse witnesses, the right against compelled self-incrimination, and the right to call witnesses; and
> (4) That if a plea of guilty or nolo contendere is accepted by the court there will not be a further trial of any kind, so that by pleading guilty or nolo contendere the defendant waives the right to a trial; and
> • • • •
> (d) *Ensuring that the plea is voluntary*. — The court shall not accept a plea of guilty or nolo contendere without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or

(continued...)

It is abundantly clear from our review of the transcript of the plea hearing that the circuit court adhered to the requirements of both *Call v. McKenzie* and Rule 11 during its thorough plea colloquy with the petitioner. Notably absent from the record is any indication that the petitioner's behavior and statements during the plea hearing would have caused the circuit judge to be concerned with his ability to understand the nature of the proceeding. Nonetheless, the petitioner argues that the circuit court should have determined whether his alleged bipolar disorder affected his decision-making ability. Like other courts, we reject this argument because there is nothing in the record that indicates the petitioner's plea was not intelligently, knowingly, and voluntarily made.

In *People v. Lafoe,* 905 N.Y.S.2d 679 (N.Y. App. Div. 2010), the defendant argued her guilty plea was involuntary due to the trial court's failure to hold a competency hearing after she announced during her plea colloquy that she suffers from bipolar disorder. In affirming the defendant's conviction, the court stated

> [d]espite being informed by defendant of her alleged mental disorder, ". . . such history does not necessarily render a defendant incompetent to enter a knowing and voluntary plea[.]" . . . the record reflects that defendant actively

---

[18](...continued)

of promises apart from a plea agreement. The court shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the attorney for the state and the defendant or the defendant's attorney.

19

participated in the plea colloquy, answered County Court's questions intelligently, acknowledged that she understood the consequences of the plea and the nature of the proceedings, had conferred with counsel and accepted the terms of the plea agreement. As there is nothing in the record indicating that defendant lacked the capacity to enter a knowing, intelligent and voluntary plea, it was not an abuse of discretion for County Court to accept the plea without holding a competency hearing[.]

905 N.Y.S.2d at 681 (internal citations omitted). Likewise, in *Koenig v. State*, 121 P.3d 780 (Wyo. 2005), the defendant argued that his guilty pleas were "involuntary because he was suffering from bipolar disorder, which rendered him incompetent to enter his pleas." *Id.* at 782. In addressing this issue, the court stated:

His broad claim that he suffers from bipolar disorder . . . is insufficient to establish he was incompetent to knowingly and voluntarily enter his guilty pleas. (internal citation omitted).

[O]ur review of the record supports a finding that Koenig's guilty pleas were knowingly, intelligently, and voluntarily made. The transcript from the change of plea hearing reveals the district court very carefully complied with the mandates of W.R.Cr.P. 11. . . . [T]he district court thoroughly advised Koenig of his rights and the ramifications of his decision to plead guilty. Koenig indicated his understanding of the charges and their attendant penalties, the consequences of his guilty pleas, and the rights he would relinquish if he entered those pleas. We are satisfied Koenig was true to his word when he stated to the court he was entering his pleas voluntarily and of his own free will.

121 P.3d at 782-83; *see also, Rice v. Com.*, No. 2012-CA-000360-MR, 2013 WL 3237367 (Ky. App. June 28, 2013) (finding alleged prior diagnosis of bipolar disorder, schizophrenia, and post-traumatic stress disorder did not speak to issue of competency exhibited by

defendant at time he appeared in court, engaged in lengthy plea colloquy, and made decision to knowingly and voluntarily plead guilty); *People v. Sylvan*, 969 N.Y.S.2d 578 (N.Y. App. Div. 2013) (finding trial court's thorough inquiry adequately demonstrated that defendant was fully able to understand plea proceedings notwithstanding his bipolar disorder); *Commonwealth v. Baney*, 860 A.2d 127, 132 (Pa. Super. Ct. 2004) (addressing defendant's argument that he was unable to understand his guilty plea proceedings because he supposedly suffers from bipolar disease and finding he had unequivocally stated that he understood all questions being asked and was entering his guilty plea voluntarily and that it was "[o]nly after the court was satisfied that Baney knew all of his rights and was making an intelligent and voluntary decision, did it accept Baney's negotiated guilty plea . . . . As such, Baney's claim is frivolous and provides no basis for relief."); *Douglas v. State*, No. 08-09-00027-CR, 2010 WL 2196082, at *2 (Tex. App. May 28, 2010) (finding trial court did not abuse its discretion by failing to conduct informal inquiry into defendant's competency after she testified that she had been recently diagnosed with "schizoaffective disorder and bipolar disorder, suffered from hallucinations, and was taking medications that quiet the voices she hears and control her racing thoughts[]" where record showed defendant's testimony was "lucid, her answers to the questions posed were responsive and clear, and [] [she] coherently relayed her side of the story.").

As demonstrated in this line of cases, even if we were to assume the petitioner's alleged bipolar diagnosis is accurate,[19] the record flatly contradicts his contention that his guilty plea was not intelligently and voluntarily made. Throughout the circuit court's plea colloquy with the petitioner, his answers to the circuit judge's questions were responsive and clear. The petitioner repeatedly assured the circuit judge that he understood each of the constitutional rights that he would be waiving through his guilty plea and that the decision to plead guilty was his alone. Further, the petitioner and his counsel confirmed that they had met at length before the petitioner accepted the terms of the plea agreement. Moreover, the petitioner's counsel, who had ample opportunity to observe the petitioner's behavior and demeanor, both prior to and during the plea hearing, informed the circuit judge that the petitioner was "lucid and knows where he is and why we're here and what he's doing" and had always been "oriented as to time and place" and able "to recall past events."[20]

In short, there is nothing in the record that would lead this Court to find the petitioner's guilty plea was either improperly given by him or improperly accepted by the

---

[19]There is no medical evidence in the record to support the petitioner's assertion that he has been diagnosed with bipolar disorder. However, even if there were, it would not alter our decision.

[20]Although the petitioner now claims that a statement he made during his pre-sentence interview raises a question as to whether he had taken his antidepressant medications the morning of his plea hearing, the record reflects that he stated during the plea hearing that he takes his antidepressant medications once daily–at night–and he gave no indication that he did not take his medications, as prescribed.

circuit court.  The record is simply bereft of any such evidence.  Accordingly, we find the petitioner's guilty plea was voluntarily, knowledgeably, and intelligently made.

## B.  Sentencing

The petitioner asserts that his sentence to life imprisonment without the possibility of parole is disproportionate under article III, section 5 of the West Virginia Constitution[21] because his co-defendants were sentenced less harshly.  He contends the circuit court inappropriately relied upon witness statements that he shot the victim in making its sentencing decision.  Although these statements were contained within the pre-sentence report that was accepted, without objection, during the sentencing hearing, and notwithstanding the petitioner's admitted understanding that he would lose his right to confront his accusers by pleading guilty, he now contends that the circuit court should not have considered those adverse statements because they were not subject to cross-examination.  The State argues that the petitioner's sentence is within the sound discretion of the circuit court and that disparate sentences are not per se unconstitutional.

---

[21]Article III, section 5 of the West Virginia Constitution provides, as follows:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted.  Penalties shall be proportioned to the character and degree of the offence.  No person shall be transported out of, or forced to leave the State for any offence committed within the same; nor shall any person, in any criminal case, be compelled to be a witness against himself, or be twice put in jeopardy of life or liberty for the same offence.

23

As we explained in *Goodnight*, "[s]entences imposed . . . within statutory limits and if not based on some [im]permissible factor, are not subject to appellate review." 169 W.Va. 366, 287 S.E.2d 504, syl. pt. 4, in part.  The petitioner pled guilty to first degree felony murder, which carries a penalty of life imprisonment under West Virginia Code § 61-2-2 (2014).  Therefore, the sentence imposed by the circuit court was unquestionably within statutory limits.

Turning to the petitioner's contention that his sentence is disproportionate to the sentences imposed on his co-defendants, this Court has held that

> "[d]isparate sentences for codefendants are not per se unconstitutional. Courts consider many factors such as each codefendant's respective involvement in the criminal transaction (including who was the prime mover), prior records, rehabilitative potential (including post-arrest conduct, age and maturity), and lack of remorse. If codefendants are similarly situated, some courts will reverse on disparity of sentence alone."  Syl. Pt. 2, *State v. Buck*, 173 W.Va. 243, 314 S.E.2d 406 (1984).

Syl. Pt. 3, *State v. Robey*, 233 W.Va. 1, 754 S.E.2d 577 (2014).  Similar to the case at bar, in *Robey*, the defendant pled guilty to a felony murder committed during a burglary.  He was sentenced to life imprisonment without the possibility of parole.  Although Robey's co-defendants received less severe sentences, we affirmed Robey's sentence, which was based, in part, on the lower court's finding that he had killed the victim and had a high likelihood of recidivism.

24

In sentencing the petitioner, the circuit judge relied heavily upon the pre-sentence report, as she had forecasted during the petitioner's plea hearing. With regard to the *Robey* factors, the pre-sentence report disclosed the petitioner's eight prior felony convictions; his high potential for recidivism; his dubious rehabilitative potential;[22] and the likelihood that he shot the victim based upon statements given by his co-defendants and others. While the petitioner challenges these adverse statements that he was the shooter, when questioned by the circuit court during the sentencing hearing concerning the "factual matters set forth in the (pre-sentence) report," his counsel responded, "There is nothing that is factually inaccurate in the report[.]" Moreover, during the sentencing hearing, the petitioner admitted that he had "played a great deal of a role in this crime" and that he did not "expect to get mercy."

With regard to the final *Robey* factor–the petitioner's remorse–the transcript of the sentencing hearing reflects the petitioner's apology to the victim's family, his family, and the court during his allocution. The pre-sentence report cautioned, however, against attributing any sincerity to the petitioner's claims of remorse:

> As this Officer has repeatedly dealt with [the petitioner] for years and is quite familiar with him, this Officer cannot stress enough a belief that [the petitioner] . . . is masterful at appearing

---

[22]As indicated previously, the probation officer advised in the pre-sentence report that "[r]ecords show [the petitioner] has a history of failing to tell the truth and trying to manipulate others . . . while, at the same time, appearing as though he is seemingly compliant, worthy and capable of rehabilitation or change[.]"

remorseful, genuine, and sincere, though all, in this Officer's opinion, is a performance or ruse.

Given all of the above, even if we were to assume that the witness statements identifying the petitioner as the shooter are inaccurate, our analysis of the *Robey* factors compels the conclusion that the circuit court did not abuse its discretion[23] by imposing a harsher sentence upon the petitioner than the sentences imposed upon his co-defendants. *Robey*, 233 W.Va. at 3-4, 754 S.E.2d at 579-80; *see also* syl. pt. 1, in part, *Lucas*, 201 W.Va. 271, 496 S.E.2d 221(holding sentencing orders are reviewed under deferential abuse of discretion standard).

## IV. Conclusion

For the reasons stated above, the December 12, 2013, re-sentencing order of the Circuit Court of Kanawha County is hereby affirmed.

Affirmed.

---

[23]Whether a person convicted of first degree murder following a guilty plea will be eligible for parole is left to the sole discretion of the trial court. *See* W.Va. Code § 62-3-15 (2014) ("[I]f the accused pleads guilty of murder of the first degree, the court may, in its discretion, provide that such person shall be eligible for parole. . . .").